WILFORD YORK, RESPONDENT, v. LEE G. DANIELS, APPELLANT.—259 S. W. (2) 109.

Springfield Court of Appeals.   Opinion filed May 8, 1953.

810

*John R. Caslavka,* of Greenfield, *Neale, Newman, Bradshaw. Freeman & Neale. Jean Paul Bradshaw, Harry G. Neale, Walter S. Pettit, Jr.,* of Springfield, for Appellant.

812

*Joe W. Collins,* Stockton, Missouri, for Respondent.

816

VANDEVENTER, P. J.—This is an action against a chiropractor for malpractice resulting in the death of plaintiff's wife. It was tried to a jury which returned a verdict for plaintiff in the sum of $5000.00. From a judgment thereon, defendant has appealed. For clarity, we will refer to the parties hereafter as plaintiff and defendant, the roles they played in the trial court.

The negligence charged in the petition was that "defendant failed and neglected to exercise the ordinary skill and care used by other chiropractors in said locality, in that said defendant negligently, carelessly and unskillfully manipulated her head and neck by taking hold of her head and neck and jerking, twisting, popping, pushing, rubbing, massaging and gouging her neck and head with such force and violence and in such a negligent, careless and unskillful manner that he injured the plaintiff's said wife's spinal meninges (spinal cord coverings) in the area of the vertebrae consisting of the first three from the cervical spine, namely, the atlas (1st), the epistropheus or axis (2nd) and 3rd cervical vertebrae, resulting in intraspinal bleeding, compression of the spinal cord, spinal concussion, shock and death."

It is earnestly and ably contended that plaintiff did not make a submissible case. In determining this question, this court must consider the whole evidence, giving plaintiff the benefit of all facts and circumstances favorable to or tending to support his theory of the case with every reasonable inference that may be drawn therefrom, as well as any evidence offered by defendant, and such inferences as

are favorable to plaintiff and we will disregard any of defendant's evidence contradictory or unfavorable to plaintiff's contentions. Williamson v. St. Louis Public Service Co. (Mo.) 252 S. W. (2) 295, Wofford v. St. Louis Public Service Co. (Mo.) 252 S. W. (2) 529. Barton v. Farmers Ins. Exchange (Mo. App.) 255 S. W. (2) 451. Scott County Milling Co. v. Thompson (Mo. App.) 255 S. W. (2) 121.

The following definitions may be helpful:

The *Cervical Vertebrae* are the seven vertebrae of the neck, the first is named the *Atlas*, because it supports the globe of the head. The second cervical vertebra is named the *Epistropheus* or *Axis*, because it forms the pivot upon which the first vertebra, carrying the head, rotates.

The *Meninges* are the three membranes that envelop the brain and spinal cord, including the *Dura, Pia* and *Arachnoid*.

*Congenital* means a condition present at birth.

An *Aneurysm* is a sac formation by the dilation of the walls of a blood vessel and filled with blood.

*Pia Mater* is the innermost and the most vascular of the three membranes of the brain and the spinal cord.

*Vascular*, as above used, means full of vessels.

A *Pathologist* is one learned in that branch of medicine, which treats of the essential nature of disease, especially of the structural and functional changes caused by disease.

Bearing in mind the rule of law above stated and these definitions, we will state the evidence accordingly.

Plaintiff and his wife lived at Stockton, Missouri and had lived there 12 years prior to the incident upon which this suit is based. Plaintiff was 35 years of age and the deceased was 31. They had three children, ages 9, 4 and 2, respectively. Their family physician was Dr. Wm. B. Richter of Stockton. On May 2, 1951, Mrs. York had a stiff neck. Her eyes were bothering her and she had occasional headaches. She went to Dr. Richter for consultation. He examined her and diagnosed her case as a muscular strain, or, as a layman would call it, "a crick in the neck." For that he advised applications of heat and for her eyes and headache, he advised her to procure spectacles. He made a thorough examination and found that, other than the symptoms above referred to, she was in good health. He had been the family physician for ten years, had delivered her three children and, during her pregnancies and at other times, had examined her rather frequently.

Later a neighbor recommended that she go to the defendant, Lee G. Daniels, a chiropractor located at Greenfield, for treatment of her stiff neck, eye trouble and headache. Five days after she had gone to her family doctor at Stockton, she, her husband and two of their children went to Greenfield to consult the defendant. Prior to this time, she had been doing all her housework and caring for their

three children. When they arrived at Greenfield, they left the automobile, walked to the court house rest rooms, then back to the car, where the two children had remained. She picked up the youngest child, two years old, the husband the other and they walked across the street, each carrying one of the children, and into the defendant's office. After a few preliminary questions relative to their age, business and occupation, the chiropractor then asked Mrs. York about her trouble. She told him she had a stiff neck, had had it for several days, that her eyes bothered her, that she had occasional headaches and her family doctor had advised her to get glasses. She was instructed by the chiropractor to go into a dressing room and put on a gown, which she did, and returned to the "adjusting" room.

The defendant then gave plaintiff and his wife, they being the only ones present, a long dissertation, or sales talk, on the theory of chiropractic, illustrating it by means of an artificial vertebra made of plastic or rubber. With this contraption he attempted to demonstrate how it was possible for a vertebra to become misplaced and pinch a nerve. He explained that in making adjustments the displaced vertebra must be moved quickly so as not to move the one below or above it. He likened it to a magician jerking a table cloth from a table so quickly that an article on the table would not be displaced.

He then had her lay face downward on a self-tripping (high-lo) table and told her that she had some misplaced vertebrae and proceeded to manipulate her spine proceeding upward to her neck. When he had gotten to that portion of her vertebra, he raised the table, to a perpendicular position, so she was standing facing it and asked her how far she could turn her head to the left and to the right. She demonstrated how far she could. She could turn it further to the right than to the left. Standing at her back and a little to her left side, he took hold of her head and neck and suddenly and violently jerked or turned it as far as he could. The neck popped and she screamed, and without releasing her, he then quickly and violently turned her head in the other direction. The neck again popped, she screamed again and cried, "I'm falling, I'm falling." After the chiropractor had jerked Mrs. York's head to the left and she had screamed, jerked it the other way and she had screamed again, and said she was falling, "He kept saying: 'I will have to give her another treatment and bring her around.' He kept gouging her in the neck and punching her in the neck and rolling her head around. He would say: 'I never saw a person any more relaxed.' He kept gouging her in the neck."

Her husband and the chiropractor then took hold of her and helped her to a chair, she couldn't hold up her head, her face and hands were numb, she couldn't use her feet and she began retching. The chiropractor got a wet towel and something for her to vomit in. Her husband asked her if she hurt anywhere and she said "No."

But she was apparently in convulsions and it was necessary to hold her in the chair. The chiropractor then suggested that they take her back and lay her on a cot. This was done and it was necessary to hold her on the bed to prevent her from rolling off. She would try to reach her face with her hands but couldn't. She continued to vomit and seemed to have lost all control over her movements.

The chiropractor tried to cool her with wet towels, but she kept getting worse until they could hardly hold her on the bed, so the chiropractor said, "I will go get a doctor." He left through the back door, was gone approximately two minutes, came back and stated, "The doctor will be right over."

In a few minutes Dr. Lee A. McNeel came in the back way, looked at her eyes, felt of her pulse and said, "Let's take her to a hospital as quick as we can get her there." The plaintiff rather demurred to this procedure because he did not know what the doctor was going to do with her but the doctor said, "We will have to take her right now." They brought the ambulance around and the chiropractor wanted to take her out the back door but they could not get the stretcher out that way, so they took her out the front door and into the ambulance. After her arrival at the hospital, she didn't roll so much, but could only answer yes and no to questions, except she said she was numb all over. She seemed to be paralyzed. When she uttered a word, it produced vomiting. She was again asked if anything hurt her and said "No." Apparently she had lost her sight for she could not see her children who were brought in. The plaintiff went back to Stockton and got their oldest child and returned to the hospital where he stayed until 9 o'clock, then leaving upon the assurance of the nurses and doctor that his wife would be all right in the morning. The next morning at 6:45, he received a telephone call to come to the hospital at once. When he got there, his wife was dead.

After an interval, plaintiff went back to Greenfield to find the chiropractor but was unsuccessful. The next day, he went back and still could not find him. Two or three days later, he went back and the chiropractor was still gone, although he had asked plaintiff to report to him on his wife's condition.

After the funeral, the plaintiff discovered that Dr. McNeel had filled out the certificate of death and given as the cause, "Congenital aneurysm ruptured." This death certificate also stated that there was an interval of 18 hours between "onset and death." Plaintiff was not altogether satisfied with Dr. McNeel's diagnosis as to the cause of death, he talked to several doctors, friends and his attorney and a few days later he and his attorney came to Springfield to find out what a congenital aneurysm was. The more he investigated, the more certain he became that the cause of death given in the certificate was erroneous, and having witnessed the occurrences in the chiropractor's office, he came to the conclusion that she had died because

of the violent "manipulations" and not from a ruptured congenital aneurysm.

After talking to the doctors, among whom was Dr. Murray Stone, a pathologist of many years practice in Springfield, and who operated the Stone Clinical Laboratory, he decided to have his wife's body exhumed, brought to Springfield for a complete autopsy or post mortem examination in an endeavor to ascertain the actual cause of death. A post mortem examination was made on the 21st day of May, 1951, in an undertaking establishment in Springfield, by Dr. Murray Stone of the Stone Clinical Laboratory. This autopsy included an examination of the peritoneum, liver, pleural cavities, lungs, heart, pericardium, heart muscles and valves, aorta, coronary arteries, stomach, pancreas, spleen, thoracic aorta, abdominal aorta, kidneys, uterus, brain, membranes and blood vessels. A section of the spinal column was removed enbloc, consisting of the atlas, axis and third cervical vertebra. This portion of the spine was taken directly from the undertaking establishment to the laboratory and further examined. The report of Dr. Stone then shows:

"On dissection the neck muscles away from the upper cervical spine and the occipital bone some blood exuded from between the axis and the atlas on the left side. This was later found to be due to a blood vessel cut during the dissection.

"The muscles and ligaments were dissected from the upper cervical spine which was freed from its attachments to the occipital bone and sawed transversely through the lower part of the body of the 3rd vertebra and the 1st, 2nd, and 3rd vertebra removed enbloc. No evidence of fracture or dislocation is seen. Upon further dissection the spinal cord contained within the canal of the part removed measures 57 mm in length. Along the left lateral and posterior side of most of the upper 1-2 of the specimen is a blood clot adherent to the spinal cord and infiltrates the nerve roots. This is 20 mm in length and 5 mm in width and rather loosely attached to the spinal cord. This area corresponds to the space between the axis and atlas."

Dr. Stone's conclusions after the autopsy under the heading "DISCUSSION" were as follows:

"In the absence of pathological changes in any of the viscera and due to the fact that an immediate violent reaction which began at the moment of manipulation and was continuous to the time of death, I would conclude that the cause of death was spinal concussion. This is substantiated by the finding of hemorrhage into the pia."

After the three cervical vertebrae had been removed from the body, taken to the laboratory and examined by Dr. Stone, they were then put in a bottle of formaldehyde, for preservation, sealed and were so kept until they were examined later by Dr. F. C. Coller, another

pathologist who had taken over Dr. Stone's business about the first of June, 1951. During the process of the post mortem examination as Dr. Stone removed and examined portions of the body of deceased, he dictated his findings to his laboratory technician, who was present and observing and followed the same procedure in his examination of the three cervical vertebrae in his laboratory the next day. These findings were reduced to writing, read and signed by Dr. Stone in the regular course of his business in operating the Stone Clinical Laboratory and became the permanent files of that office. The testimony shows that there is a rule of the American Hospital Association, American Medical Association and American College of Surgeons that detailed permanent records be kept of autopsies or post mortem examinations. They were so kept and were introduced in evidence at the trial. Dr. Stone died about three weeks after the post mortem examination and Dr. Coller, as stated, took charge of the Stone Clinical Laboratory, of its records and of the jar of formaldehyde containing the three cervical vertebrae. Dr. Coller later examined the three cervical vertebrae and found practically the same things in relation to it that had been found by Dr. Stone and so testified at the trial. He testified that the jerking of the head and neck of the deceased "could" have caused the rupture of the coverings of the spinal cord (meninges) and her consequent death.

One of the witnesses testifying for the plaintiff was M. D. Gwinn, who was a dentist and for 19 years had been coroner of Cedar County, Missouri. He was a graduate of the Kansas City Dental College, Kansas City, Missouri, now a part of the Kansas City University. He had also been an undertaker and licensed embalmer from January 1, 1918, until about six years before the trial. He had prepared for burial about 3000 bodies and had embalmed about 2000 of them. He had also witnessed many autopsies on human bodies. He was not a medical doctor and did not claim to be a pathologist but had had training in physiology and dissecting. He had dissected the whole human body. He was present and witnessed the entire post mortem examination conducted by Dr. Murray C. Stone, pathologist, and testified it was the most complete one he had ever witnessed.

He observed Dr. Stone remove the first three vertebrae from the neck of the deceased and he also saw him examine every vital organ of her body including the brain. He examined the brain himself.

While a student at the School of Dentistry and while working as an undertaker and embalmer and in his experience as coroner of Cedar County, he had many times had occasion to examine bodies, including the brain, membranes, blood vessels, veins, and arteries. During the autopsy Dr. Stone examined the brain, membranes, blood vessels, heart, peritoneum, lungs, liver, stomach, pancreas, spleen, aorta, thoracic aorta, abdominal aorta, kidneys and uterus of deceased. The brain was removed, including the blood vessels that supply the

brain and called the Circle of Willis. It was carefully examined by Dr. Stone and Dr. Stone also bisected the brain, even bisecting it cross ways. The witness found there was no ruptured aneurysm. He stated that all the organs removed and examined by Dr. Stone were normal. During the examination, Dr. Stone was dictating his findings to his laboratory technician. The arteries and veins that were examined were also normal. The body had been well embalmed, both cavity and arterial. The witness explained that in the process of embalming, the fluid was forced into the arteries and drained out through the veins and that the embalming fluid must follow the circulatory system. If there had been a ruptured aneurysm in the Circle of Willis, the embalming fluid would not have removed the blood that had gone out into the tissues from the blood vessels. The body was well preserved and had been excellently embalmed. When the examination was completed at the undertaking establishment and the section of vertebra removed, witness Gwinn said to Dr. Stone, "Doctor, you didn't find it yet" and the doctor replied, "I have not. I will have to take it to a laboratory."

H. L. McCann testified for the plaintiff. He had been an undertaker and licensed embalmer for thirty years and was present at, and an employee of, the undertaking establishment in Springfield when and where Dr. Stone made the post mortem examination of the deceased. He assisted in the entire autopsy. Previous to this time he had handled and embalmed several thousand bodies and assisted in two or three hundred autopsies. He saw the various organs examined by Dr. Stone while conducting the autopsy and in his opinion they were all sound and healthy organs. He removed the three cervical vertebrae from the body and assisted in removing the brain. There wasn't any blood in the brain or ruptured blood vessels. With the brain was removed the Circle of Willis and there was no evidence of a ruptured blood vessel. He described the method of embalming and said that in the body, under inspection, the circulation of embalming fluid had been fairly good. If there had been a ruptured blood vessel in the brain of deceased, there would have been no possibility of the embalming fluid washing it away. There was no evidence of any ruptured blood vessel or aneurysm in the brain.

He too testified that while Dr. Stone was making this examination, he was dictating his findings to his laboratory technician and she wrote them down at the time. He actively helped Dr. Stone perform the autopsy. He was not present when the three vertebrae were examined in the laboratory by Dr. Stone, neither did he examine the portion of the spinal cord or spinal canal in. the three vertebrae removed.

Hazel Browser was a laboratory technician working in the Stone Clinical Laboratory and with Dr. Stone. She had worked there four years and five months. She was present at the time of the post

mortem examination and took down Dr. Stone's dictation as he progressed with the autopsy. Dr. Frederick C. Coller, a pathologist, succeeded Dr. Stone in charge of the Stone Clinical Laboratory. Dr. Stone died on July 12th. She wrote down exactly what Dr. Stone dictated about the various organs and other portions of the body of deceased as he examined them, both at the funeral parlor and the next day in the laboratory when he made a minute examination of the three vertebrae and the spinal cord and cavity therein. Her notations and the complete report were kept in the permanent records of the office and she identified them as well as the three vertebrae which had been preserved in formaldehyde. It had always been the custom to keep as permanent records all memoranda, writings and records made during the performance of an autopsy. She testified as to what she saw and read from the original notes taken in longhand during the autopsy. The notes taken by her and the completed report were introduced in evidence. She testified partly from memory, refreshed by an examination of the original notes as to the findings of Dr. Stone. Her testimony was identical with her original notes and the written report.

After Dr. Stone's death and after Dr. Coller had succeeded him in charge of the Stone Clinical Laboratory, Dr. Coller examined the three vertebrae, which had been preserved in formaldehyde, and which were in the same condition as when they were removed from the body.

Dr. F. C. Coller testified for plaintiff. He had been practicing pathology for approximately six years. He received his medical degree from St. Louis University and pursued a specialized course in pathology for three years. He was certified by the American Board of Pathologists as a specialist, which was as high as one could go in that specialized field. He was then approved by the American Board of Examiners. At the request of Dr. Stone, about the 1st of June, 1951, he had taken charge of the Stone Clinical Laboratory. He was a pathologist for St. John's Hospital, Springfield Baptist Hospital and consultant at the U. S. Medical Center and for the Veterans' Administration. He had been in charge of the Laboratory since June 1, 1951, continuously, as Dr. Stone died about June 12th or 13th. He identified the three vertebrae that had been taken from the body of deceased and retained among the permanent exhibits of the laboratory. He testified that pathologists were required to keep permanent records of autopsies and post mortem examinations by the American Hospital Association, the American College of Surgeons and the American Medical Association. He had examined the vertebrae in question about the 5th day of July, 1951, and had made a memorandum of his findings as soon as he could wash his hands after the examination.

Relative to that examination, he testified:

"The vertebrae consists of the first three from the cervical spine, namely, the atlas, the axis and the third cervical vertebrae. The external bony characteristics are normal and no fractures are

noted, a finding further corroborated by negative X-rays of the cervical spine for fractures.

"Examination of the vertebral canal which is the hole in the center of the vertebrae from the upper aspects. The top of the atlas reveals about 30 mm. of an elongated mass of dark red, fixed blood lying alongside the left postero-lateral or left back portion and left back portion of the canal of the vertebrae. This column of blood started near the lower portion of the atlas, which is the 1st vertebra, and it continued downward in an unbroken column to the mid portion of the 3rd cervical vertebra. This column of blood was 4 to 5 mm. wide. The joints and supporting ligaments do not appear abnormal.

"Also present are two portions of spinal cord which had previously been dissected out of the vertebral canal. From the lower portion of the part of the spinal cord which measured 35 mm., a section was taken by Dr. Stone for microscopic study. This section represents an area adjacent to the junction of the 1st and 2nd vertebrae. The second portion of the spinal cord measured 20 mm. A close examination of the cord revealed small fragments of blood adherent to the left lateral, again the side, and the back side of the cord at the level corresponding to the junction of the 1st and 2nd cervical vertebrae.

"Microscopic examination, after preparing this section of the spinal cord and putting it on a slide and examining it through the microscope, revealed that there was a pink staining edema fluid which had separated a portion of the cord, sort of pushed it apart. Then adherent to the pia mater, which is one of the three coverings of the spinal cord, alluded to by Mr. Bradshaw, adherent to that in the left lateral and postero-lateral regions was a moderate number of red blood cells. Also in this region of the cross section of the cord there is a marked congestion of the vessels of this pia mater. There are no distinct nerve or inter-nerve cell changes in the substance of the cord.

"A small portion of the blood adherent to the left lateral and the postero-lateral or the back part of the vertebral spine revealed that this blood is composed of normal appearing red blood cells which show little disintegration. Therefore, this represents fresh blood, most likely less than 24 hours old, as does the blood adherent to the pia mater of the cord. A minimal amount of hemosiderin which is a blood breakdown product pigment is present.

"Those were the objective findings that I saw in examining the cord. They do not include the conclusions."

He further testified:

"I feel that in this case we are dealing with an injury to the spinal meninges which are the three coverings of the cord, which

has resulted in intraspinal bleeding and further caused compression of the spinal cord.''

It was his opinion that the condition he discovered could have caused death within 18 hours after the injury that caused it, and that what he observed could have been caused by momentary vertebral displacement or by an act of violence.

Plaintiff's evidence was then reviewed in a hypothetical question and the doctor was asked if he could state with reasonable certainty that the jerking of the neck of deceased was a competent and producing cause of injury to the spinal meninges, resulting in intraspinal bleeding and compression of the spinal cord and he answered that it could. He said that the symptoms of such an injury would be vomiting, shock, paralysis, dilated or constricted pupil of the eye on the affected side, loss of sensation to any type of stimulus, such as pinching, burning or sticking. Those symptoms could be present in this type of cord change.

The Doctor stated that he had read the report of Dr. Murray Stone on the autopsy and that taking into consideration his own examination of the vertebrae, that the injury could have been the direct cause of death. He stated:

"There are no other diseased processes going on in the body at that time with the exception of the one in the cervical vertebrae to account for the cause of death."

In being cross-examined about the condition he found, he was asked:

"Q. You don't mean to tell this jury at all what did happen or what did cause her death do you, you don't know do you doctor?

"A. This was the only change found to be the cause of her death."

He also stated it was possible to displace a vertebra by a sudden, quick, sharp, snappy turn. He further testified that the condition he found in the vertebrae was caused by a ruptured blood vessel which could have been caused by any type of trauma or twisting of the head. The reaction from such an injury could happen immediately. There was no displacement or break in the three vertebrae and they were in perfect alignment, but there was a ruptured blood vessel in the spine. If a blood vessel was ruptured, it would not be possible for the spilled blood to be washed out in the process of embalming.

Dr. Lee A. McNeel was a witness for the defendant. He was the physician that the chiropractor called in to examine the deceased and he found her in a semi-conscious condition, vomiting, her left pupil dilated, diminution of sensation on the left side, and recommended that she be immediately taken to a hospital. He saw her for a few minutes at the chiropractor's office and that evening in the hospital. He was called the next morning early but arrived at the hospital after her

death. He recorded in the death certificate that the cause of death, (his impression) was "congenital aneurysm ruptured" and that the interval between onset and death was 18 hours. He had never seen the patient before being called to the chiropractor's office. He identified the hospital records as being correct and they showed that the patient didn't respond to painful stimuli (pin pricks) on the left half of her body, was in a semi-comatose condition, nauseated and vomiting, extra beats of her heart, was unable to void and the patient was catheterized. He obtained no history of the case except she had been "manipulated" in the defendant's office. He thought that there had been a rupture of one of the blood vessels of the Circle of Willis, which is located at the base of the brain and it was his opinion that if there was a rupture at that place, it would be seen by one conducting a proper post mortem examination. He observed no other injury to patient's nervous system except what he diagnosed as a congenital aneurysm ruptured. Part of the blood vessels emanating from the Circle of Willis goes into the brain and part of it around the brain on the outside.

Dr. A. R. Cain, a witness for defendant testified that if the brain was removed, any rupture in the Circle of Willis would be easily seen, that in a post mortem examination, the Circle of Willis is removed with the brain.

The defendant testified that he had been practicing his profession about three years. He stated that when the plaintiff and deceased were in his office, he asked the deceased her name, address, occupation and age. He took her back, showed her the dressing room, gave her a gown, told her to put it on and return to the "adjusting room". When she returned to the adjusting room, he placed her on a "palpating" stool. He asked her what her trouble was and she said she had a stiff neck, that she had had it for some time, that it gave her arm symptoms and headaches. She said she had had a previous sore throat and she had doctored herself by taking "aspirins". She did not tell him about having consulted her family physician. The doctor testified that he examined the neck by palpation, asked her to turn her head to the right and to the left to see how far it would turn. This was while she was sitting on the palpating stool. She seemed to be nervous. He talked to her and explained the chiropractic principles. He then placed her on what is called a "high-lo" table. You place the patient on it in a standing position, then they lean against it and it tips over until the patient is lying on her stomach. It has a foot board at the bottom to stand on. By his examination, he noted an extreme tenderness in the region of the 5th, 6th and 7th dorsal vertebrae, while she was on the palpating stool. After she was on the table he adjusted the 7th dorsal vertebra, which is between and a little below the shoulders and the patient relaxed some. He then examined the neck, asked her to turn her head to the right, which she did. She was lying down

at the time. He then asked her to turn her head to the left, which she did, "just part way and said, 'Oh'." He asked her to turn her head straight again and told her to turn and face the other direction. He held her head in his hands. He turned her head and when it straightened back up, "the reaction started taking place." He recalled no popping of the neck. He said he noticed there was a glazing of the eyes, like she was going to faint, so he left her lying on the table. She passed into a semi-conscious state and he realized it was something besides fainting. He then asked her if she wanted to sit up, she signified she did and he and the plaintiff took hold of her and put her in a chair at the foot of the table. She leaned against her husband and he asked if she would like to lie down. The two of them carried her back and laid her on a resting cot. She began to sweat profusely, she started vomiting. He got a basin and cool cloth and washed her face. He recognized there was something wrong "not in the chiropractic field". He took his stethoscope, examined her heart and found nothing abnormal. He then told the plaintiff he was going to get a medical doctor and he did go and get Dr. McNeel. The doctor came in a short time. The doctor examined her and suggested that she be taken to the hospital. The record before us then shows:

"Q. Doctor, in the examination you described to us did you use only methods and appliances which are recognized generally among chiropractors in this community or like communities as suitable for treatment of such a case?

"A. Yes, sir.

"Q. Did you use your best judgment as to what appliances and methods to use in the treatment and examination of this case as you described it?

"A. Yes, sir.

"Q. Throughout such treatment did you exercise care and skill?

"A. Yes, sir."

While she was on the table, he examined the full spine from the 7th cervical to the 5th lumbar, this while she was face downward. He denied taking hold of her head while she was in a standing position and giving it a quick sudden jerk in one direction and then in the other. He stated that the only word he heard from her, except normal conversation, was when she said "Oh" when she tried to turn her head to the left. He didn't remember her saying, "I am falling". He admitted testifying in a deposition that he told plaintiff and deceased that he could feel the atlas and axis were out of alignment far enough to cause pressure on the nerves. The way to put it back is, "Make a point of contact on the spinous process of the axis."

Arlond D. Murray, a chiropractor, (location of office and residence not shown) testified as an expert for the defendant. He claimed to be familiar with the methods and appliances which are generally recog-

nized among chiropractors in the Greenfield community as suitable for the treatment of such a case as was described by plaintiff and defendant when they testified. The record shows the following questions and answers:

"Q. I will ask you if the method of examination preliminary to treatment described by the defendant was in fact the methods and appliances which are recognized generally among the chiropractors in the community or like communities as suitable for the treatment of such a case?

"A. Yes, sir. From the symptoms and evidence that would be the correct manner of proceeding for an examination.

"Q. That would be the method used by your school of teaching and your school of thought, that is, the chiropractor school?

"A. Yes, sir.

"Q. ·Doctor, if in fact it happened the way the plaintiff said, that is, if in the turning process the head popped and if it was turned back and the head popped this way (demonstrating) and if the patient indicated some pain or said: 'I'm falling' or 'I'm fainting' or something of that kind, I will ask you if that still would be the recognized method of treatment of a case of this kind, if, in fact, it had gotten to that stage and if the treatment were like the plaintiff had described.

"A. Yes, sir.

"Q. It still would be?

"A. Yes, sir."

He stated on cross-examination that he often had patients scream and faint while receiving adjustments, but, though asked, he did not say that any of them had died.

B. O. Boring, a chiropractor living in Kansas City, presently President of the Missouri State Chiropractic Examining Board and actively engaged in the practice of chiropractic in Kansas City testified for defendant as an expert. According to his testimony, he must have been a very busy practitioner. On Monday, Wednesday and Fridays in his office, he would adjust from 70 to 125 patients from 9 a. m. to 8 p. m., or in a period of eleven hours. On the 125 patient days at that rate he would, according to mathematical computation, give each patient 5.28 minutes total time, less than 10 seconds for an examination, diagnosis, and where needed, adjustment of each of the thirty-three vertebrae. On 70 patient days, he would have allowed each of them less than 9½ minutes. This computation would not allow any time for lunch, dinner or other out periods. He did not explain how he could examine, diagnose and give a proper adjustment so quickly. He further testified that he was excused from military service "in the 40's in order to take care of the people at home as I had a large practice * * * I was excused to keep the people on the job at home." The record then shows the following:

"Q. Doctor, have you been in the court room and yesterday did you hear the testimony of the plaintiff who told what he understood had taken place with reference to the manner of the examination and preliminary adjustment which Dr. Daniels made on his wife, Mrs. York? Did you hear that testimony? A. Yes, sir.

"Q. Were you in the court room and did you hear the testimony of Dr. Daniels himself when he was on the stand as to what he actually did there? A. Yes, sir.

"Q. Doctor, in your position and because of your practice are you acquainted with the methods and appliances which are recognized generally among chiropractors in the community, in this community or like communities as suitable for treatment of such a case as you heard described from the stand here? A. Yes, sir.

"Q. I wish you would state whether or not the method described by Dr. Daniels in his testimony was, in fact, the only methods and appliances which are recognized generally among chiropractors in this community or like communities as suitable for the treatment of such a case as that of Mrs. York as described from the stand? A. It was suitable, yes."

He further testified that taking the plaintiff's version of the transaction as true, it was still the correct method.

On cross examination, he stated that if the adjustment were properly made, there would be no chance of injuring a patient.

It is contended by appellant that his motion for a directed verdict at the close of all the evidence should have been sustained, that there was shown no causal connection between the treatment and the injury, that the treatment was not the proximate cause of the injury, and that there is no evidence that the treatment was not such as is generally approved, taught and practiced by chiropractors in the community where it happened or similar communities.

We cannot agree with this contention. We think the evidence favorable to the plaintiff, as a whole, made a jury question. The deceased went into the chiropractor's office in good health except she needed eye glasses and had a muscular strain, which is a common and rather minor affliction. She had been in good health according to her family physician, other than this, for approximately 10 years. She had always done her housework and cared for her three children. She was able to carry her youngest child from the automobile over to the chiropractor's office. She told him that her complaint was a stiff neck, that her eyes bothered her and she had occasional headaches. She had, so far as was known, no other afflictions. Apparently he did not make much of a physical examination, took no X-rays, or diagnosed her case in any manner except by feeling of and manipulating her vertebrae with his fingers. When she got off of the table upon which she had

been lying face downward, she stood facing it and he asked her how far she could turn her head to the right, she showed him, then he asked her to turn her head to the left. She could not turn her head as far to the left as she could to the right. With his hands he jerked her head suddenly as far as he could in one direction, her neck popped and she screamed. To the defendant, this apparently was not considered a danger signal requiring him to stop or further examine and diagnose. He immediately jerked her head in the other direction, her neck popped again and she screamed again and said, ''I'm falling.'' The chiropractor ''noticed there was a glazing of the eyes like she was going to faint'' and that there was something seriously wrong with her but he did not even stop then. He stated that he never saw anyone so relaxed, ''I will have to give her another treatment and bring her around.'' He kept gouging and punching her in the neck and rolling her head around. She was semi-conscious, vomiting, inarticulate, perspiring, unable to move her limbs to any appreciable degree, could not sit up, apparently had convulsions, the pupil of one of her eyes was dilated. She, at least partially, lost the sense of feeling in her left side and from these symptoms, she never recovered but died in the Lockwood Hospital within 18 hours. All or most of these symptoms occurred instantly after her head had been violently turned the second time by the chiropractor and before he gave her the additional treatment.

Dr. McNeel was called in and immediately said she must be taken to the hospital. He saw her again that evening for a short time and for the last time before her death the next morning about 6:45 or 7 o'clock. The record indicates that his examination of her was rather superficial. He took no X-rays, and he knew nothing about what had happened in the chiropractor's office except that she had been ''manipulated''. He performed no post mortem upon her after her death but he did sign a death certificate giving as his opinion that she died within 18 hours after the injury and that the cause of her death was ''congenital aneurysm ruptured'', later testifying his opinion was that the aneurysm and rupture were in the Circle of Willis. The jury would certainly have been justified in finding from the testimony regarding the autopsy that there was no ''ruptured congenital aneurysm'' in the Circle of Willis and it certainly would not have been unreasonable for them to have doubted the doctor's diagnosis that it was congenital, or existing at birth, he never having seen the patient until she was 31 years old and then only for two short intervals. He never did see the aneurysm, congenital or otherwise. But that isn't all. The testimony relative to the autopsy was said to have been very complete. It showed no ruptured aneurysm in the Circle of Willis and showed nothing else anywhere that would have caused death except a rupture of a blood vessel in the spinal meninges in the vicinity of the first three cervical vertebrae. Dr. Coller testified this rupture could have been

caused by the manner in which the chiropractor manipulated his patient's neck and head. Certainly there was evidence enough to convince a jury that the doctor's manipulation produced the rupture in the meninges and spinal cord. One of the experts for the defendant testified that if the manipulation had been properly administered, no ill effects would have occurred. It is not always necessary that failure to use the accepted method in treatment should be proved by expert witnesses. Richeson v. Roebber, 349 Mo. 132, 159 S. W. (2) 658, 141 A. L. R. 1.

"Expert evidence is not required where the results of the treatment are of such character as to warrant the inference of want of care from the testimony of laymen or in the light of the knowledge and experience of the jurors themselves, * * *."
(70 C. J. S. Physicians and Surgeons, Sec. 62, p. 1009)
Baird v. National Health Foundation, et al., 235 Mo. App. 594, 144 S. W. (2) 850. It can, like any other fact, be proved by circumstantial evidence. Hilton v. Mudd (Mo. App.) 174 S. W. (2) 31. She was told by the chiropractor that one of the cervical vertebrae, the axis, was subluxated or misplaced but an examination of the first three cervicals at the post mortem showed otherwise. The actual three vertebrae were produced at the trial and were "in perfect alignment." Her previous good health, absence of a misplaced vertebra, the first scream, the second scream, instantly fainting, the subsequent finding of the injury at the place adjusted and absence of any other cause of death would certainly justify the jury in finding the treatment was the proximate cause of the injury. They were not compelled to believe the testimony of the two chiropractic experts who testified for defendant and there was sufficient evidence from all the facts and circumstances to justify them in their verdict.

From a consideration of all the evidence the jury could logically come to the conclusion that the treatment was not as skillfully administered as was required by chiropractic teachings, theory and practice in Greenfield or similar locations.

Chiropractor Boring testified that if the treatment was properly given, there would be no evil result. The jury was entitled to consider that fact. Evans v. Clapp (Mo. App.) 231 S. W. 79. Stickleman v. Synhorst et al. (Iowa) 52 N. W. (2) 504. The rupture found in the spinal meninges was some evidence of improper treatment. State ex rel. American School of Osteopathy v. Daues et al., Judges, 322 Mo. 991, 18 S. W. (2) 487, l. c. 490. As a matter of fact, the patient was instantly stricken after the adjustment and never recovered but died within eighteen hours. The injury was at the place where the adjustment was given. There is no intimation that it was there before the treatment. The treatment, as given, could have produced such a result. The adjustment would naturally be supposed to relieve pain, cure the abnormality and consequently lengthen life. It appears to

have done otherwise, increased pain, produced a rupture of the spinal meninges and death. The chiropractor seemed to be trying to adjust a subluxated vertebra, the axis, when as a matter of fact, it was in perfect alignment. The first scream of the patient was a protest. It was disregarded and fatal consequences followed. Certainly a proper treatment, properly administered would not have ended so tragically. It was a question for the jury whether the chiropractor exercised that degree of care, skill and learning ordinarily possessed and exercised by members of his profession in good standing practicing in the same or similar localities. Persten v. Chesney, (Mo. App.) 212 S. W. (2) 469.

We have been cited to no case, and our independent investigation has developed none in Missouri, where the facts are similar to the case now before us. But there are cases in other jurisdictions. The case of Foster v. Thornton, 125 Fla. 699, 170 So. 459 involves facts very similar to this case. The Supreme Court of Florida there affirmed a judgment against a chiropractor for $10,670 and it was held that the evidence made a submissible case.

In the case of Farrah v. Patton, 99 Col. 41, 59 Pac. (2) 76, under very similar facts as are before us, except the patient did not die, the Supreme Court of Colorado reversed and remanded the cause where the trial court had held the evidence did not make a submissible case. There the court said:

"From a consideration of the evidence, it seems to us, and we hold, that the plaintiff made a prima facie showing of negligence on the part of the defendant, and of a causal connection between that negligence and plaintiff's injuries. According to the testimony, the rough treatment administered by defendant (an osteopath) was followed instantaneously by plaintiff's disability."

In Hinthorn v. Garrison, 108 Kans. 510, 196 Pac. 439, the trial court sustained a demurrer to the evidence and the Kansas Supreme Court reversed it. The facts were somewhat similar to those before us, except the patient lived. We quote from the opinion:

"It is argued that plaintiff must prove that the defendant did not exercise ordinary skill as a chiropractor. This is correct, but the quoted part of the evidence, taken by itself, without any explanation, tends to show that a chiropractor who treated a man entirely free from any trouble with his spine, who thereafter suffered as the testimony shows the plaintiff did, must have been unskillful or careless."

In Morrison v. Lane (Cal.) 52 Pac. (2) 530, in a case against a chiropractor, in affirming the judgment below, the court said:

"Negligence of a chiropractor in failing to take due care to avoid injury to undiseased parts of his patient's body may be proven without resorting to expert testimony. Brown v. Shortlidge, 98 Cal. App. 352, 357, 277 P. 134; Nicholas v. Jacobson, 113

Cal. App. 382, 386, 298 P. 505. Hence in the instant case the finding of the trial court based on substantial evidence other than expert testimony that plaintiff suffered injuries to an undiseased portion of her body as a result of defendant's negligence is binding on this court.''

In Bakewell v. Kahle, (Mont.) 232 Pac. (2) 127, a judgment against a chiropractor for $5000.00 was affirmed under facts similar to ours except the patient did not die. The court said: (l. c. 129)

''From the evidence before them, the jury could find: That defendant made a wrong diagnosis or analysis of plaintiff's condition, and that her stiff neck, headaches and sore spot behind the right ear were not due to vertebrae out of place; that there were no vertebrae out of place and the x-ray picture, taken by defendant, so showed; and that defendant should have given plaintiff no adjustment.

''The jury could also find: That during the April 8th adjustment, after plaintiff directed defendant to stop, defendant continued adjustment and manipulation with his hands and caused a rupture of a brain tumor, resulting in injury to plaintiff.

Exhaustive and informative annotations may be found in 13 A. L. R. (2) 11, and 19 A. L. R. (2) 1188.

It was clearly competent for Dr. Coller to testify in answer to a hypothetical question that the treatment given by the chiropractor ''might'' or ''could'' have produced the injury found in the meninges and spinal cord of the deceased. This evidence was admissible, Kimmie v. Terminal R. R. Association of St. Louis, 334 Mo. 596, 66 S. W. (2) 561. Wack v. F. E. Schoenberg Mfg. Co. 331 Mo. 197, 53 S. W. (2) 28. Stevens v. Westport Laundry Co. 224 Mo. App. 955, 25 S. W. 491.

As was said by Judge Hyde in the Kimmie case first cited above:

''We do not hold, however, as defendant contends that it is improper to ask an expert witness if something might, could, or would produce a certain result. An expert's view of possibility or probability is often helpful and proper. * * * Where there are other facts which tend to show an accident caused a certain condition, the assurance of an expert that it is scientifically possible is of some aid to the jury in determining what are reasonable inferences to be drawn from such facts.''

In the case before us there was much other evidence from which the jury could have found negligence on the part of defendant and the autopsy report practically eliminated everything other than the injury in that part of the spine adjusted by the chiropractor.

It is contended by defendant that the records of the Stone Clinical Laboratory were not admissible in evidence. In 1949 (Laws 1949, p. 275) Missouri adopted The Uniform Business Records as Evidence Act. It has been adopted in twenty-one states. See Vol. 9, page 387,

834

Uniform Laws, Annotated. 28 V.A.M.S. Page 95. It is now Sections 490.670 and 490.680 V.A.M.S. Those sections follow:

"490.670. The term "business' shall include every kind of business, profession, occupation, calling or operation of institutions, whether carried on for profit or not.

"490.680. A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

It will be remembered that the evidence shows that pathology records of autopsies or post mortem examinations are required to be kept by the American Hospital Association, American College of Surgeons and American Medical Association. They were so kept. Pathology is a profession. Mrs. Browser was the custodian of these records. They were properly identified. They were made at the very time of the examination of the body. As Dr. Stone examined each organ, he had his laboratory technician, Mrs. Browser, write down his observations and findings. It was made in the regular course of business at the very time "of the act, condition or event, * *." The findings were certainly relevant. It was admitted by the court after these facts were shown. It seems to us that such records so required and so made and so identified by the custodian thereof were properly admitted in evidence. We think the "* * sources of information, method and time of preparation were such as to justify its admission."

It appears from the testimony that Mrs. Browser wrote the dictation of Dr. Stone in longhand, on yellow paper at the time the examination was made, that the completed report after the examination of the three vertebrae in the laboratory which was also recorded in long hand on yellow paper, was transcribed, read and signed by Dr. Murray Stone and that the long hand notes, the signed record and the three vertebrae were kept permanently as records and exhibits in the files of Stone Clinical Laboratory. The record is not clear but apparently Mrs. Browser testified from memory and also read or refreshed her memory from the long hand notes but a careful examination of the transcript in this case shows that the testimony from memory, if any, the reading from the long hand notes, if she did so read from them, and the complete report approved and signed by Dr. Stone are identical, word for word. Her oral testimony as to what Dr. Stone said, if inadmissible, was merely cumulative and harmless.

In the case of Nichols v. McCoy, 240 Pac. (2) 569, the Supreme Court of California held that records of a coroner's office under the Uniform Business Records as Evidence Act were admissible to prove

that the blood of the deceased contained a percentage of alcohol. See also same case reported at 235 Pac. (2) 412. The holding of the Supreme Court was restated in Dobson v. Industrial Accident Com. (Cal. Ct. of App.) 251 Pac. (2) 349.

In McGowan v. Los Angeles, 100 Cal. App. 386, 223 Pac. (2) 862, 21 A. L. R. (2) 1206, it was held that under the Uniform Business Records as Evidence Act, the record made by toxicologists showing the blood of deceased contained alcohol was admissible in evidence, but there was an insufficiency of proof that the blood came from the body of deceased.

In State v. Phillips (Ohio App.) 103 N. E. (2) 14, the defendant was convicted of rape. A physician had examined the victim and taken a specimen of fluid from her vaginal tract. It was sent to a hospital for analysis. The hospital report, written in pencil, was returned to him and read by the Doctor to the jury. It was disclosed that sperm cells, which the Doctor said were male sex cells, were in the specimen. This was offered in evidence over the objection of the defendant. The court said:

"The purpose of Section 12102-23 (Uniform Business Records as Evidence Act) is to liberalize and broaden the shopbook rule, recognized at common law as an exception to the general rule excluding hearsay evidence, and to permit the admission of records regularly kept in the course of business and incident thereto, and, as applied to hospital records, to avoid the necessity, expense, inconvenience, and sometimes *the impossibility of calling as witnesses* the attendants, nurses and *physicians* who have collaborated to make the hospital record of a patient. (Citing cases.) It is hardly conceivable that a defendant in a criminal case will be deprived of a fair trial by the admission of a business record if the provisions of the statute are followed incident to the introduction of the record.

"In the instant case neither the custodian nor the person who made the analysis or report or under whose supervision it was made testified as to its identity and the mode of its preparation, as required by statute. Error was, therefore, committed in the admission of the report over objection." (Italics ours.)

But the court held its admission was harmless error as it merely corroborated the victim's testimony. See also Watts v. Delaware Coach Co. (Del.) 58 A. (2) 689.

In Melton v. St. Louis Public Service Co. (Mo. Sup.) 251 S. W. (2) 663, (l.c. 669) the Supreme Court en banc said in discussing this act:

"Cases which we have examined are clear in ruling that the statutes making admissible records made in the regular course of business crystalize a rule which is an exception to the evidence —excluding hearsay rule."

It is true that part of the report contains the historical background of the autopsy as furnished by the plaintiff. If this portion was erroneously admitted, and we do not so hold, it was testified to in detail and at length by plaintiff at the trial. There was no dispute as to the truthfulness of most of it and if that portion of the report was inadmissible, it was cumulative and harmless.

The body was taken to the autopsy room of the undertaking establishment for the purpose of ascertaining, if possible, the actual cause of death. The autopsy was made by a pathologist of high standing, who operated the Stone Clinical Laboratory. It was made in the presence of a laboratory technician, M. D. Gwinn and H. L. McCann. McCann and Gwinn were permitted to testify as experts after being qualified to the satisfaction of the court. Whether a witness's qualifications to state his opinion is sufficiently established rests largely in the discretion of the trial court and its ruling thereon will not be disturbed on appeal unless there is a clear showing of abuse. 32 C. J. S. Evidence, Sec. 458 (b). If the witness has some qualifications, he should be permitted to testify. Bebout v. Kurn, 348 Mo. 501, 154 S. W. (2) 120. Fair Mercantile v. St. Paul Fire and Marine Insurance, 237 Mo. App. 511, 175 S. W. (2) 930. White v. Atchison, Topeka & Santa Fe R. Co. (Mo. Sup.) 244 S. W. (2) 26.

We have stated heretofore the qualifications of these two witnesses to which objection has been made and we find no abuse of discretion in permitting them to testify. The weight of their testimony was for the jury. 32 C. J. S. Evidence Sec. 567. Their testimony related to what they observed while the autopsy was being conducted. See State v. Moxley, 102 Mo. 374, 14 S. W. 969.

It is also asserted by defendant that the autopsy report could not be relied upon to establish any causal relationship between the treatment and the death of patient, because in Dr. Stone's "Discussion" he relied upon what plaintiff had told him. All that this "Discussion" contains that could be based upon plaintiff's history of the case was the statement that he (Dr. Stone) considered the fact "that an immediate violent reaction which began at the moment of manipulation and was continuous to the time of death * *." Those facts at the trial were not disputed by anyone. They were testified to by the plaintiff, by the defendant and by the defendant's witness, Dr. Lee A. McNeel. We fail to see how the defendant could have been injured by those words being included in the conclusions of the pathologist.

It is also urged that the court erred in giving plaintiff's instruction No. I requiring the jury to find that the defendant "failed and neglected to exercise the ordinary skill and care used by other chiropractors in the locality where he was practicing * *." It is asserted that there was no evidence of such fact upon which the jury could make a finding. We have previously discussed that phase of

the case. We think there was sufficient evidence and that the jury was properly required to make a finding upon that issue.

It is contended, also, that the court erred in not sustaining a motion for new trial because of the disqualification of a juror, one Berniece Coiner, later foreman of the jury, who failed to answer questions that would have disqualified her. Evidence was taken on this question before the court and he overruled the motion. The transcript shows that attorney for plaintiff asked the jurors collectively this question, "Q. Have any of you ladies or gentlemen read newspaper accounts of this case or newspaper accounts of purported facts of this case? A. (No response.)"

The evidence on the motion for new trial showed that Berniece Coiner at the time of the death of plaintiff's wife was running a newspaper, The Lockwood Luminary, at Lockwood, Missouri. That she wrote a news article about the death of Mrs. York and that most of the information she obtained was from other newspapers. In the article she did not express any opinion, but upon its face, the article shows it was merely a recounting of facts and rumors concerning the case. It was written shortly after the autopsy and in the article it was stated, "At the time of Mrs. York's death it was generally talked both here and in Greenfield that the deceased came to her death from a broken neck." It also contained a quotation from the petition. This juror testified that she was operating the newspaper, that she heard of the occurrence through the Springfield papers and that she ·did write the article. She could not remember to whom she talked about the rumors of the cause of Mrs. York's death. She further stated that John Caslavka, attorney for defendant (and his only attorney until three days before the trial) came to her before the news article was written and asked her to keep any article about Mrs. York's death out of the paper. She told him it was a matter of news and she intended to write an article about it. He told her he had talked to the publishers of another paper "and they are not going to say much about it," but she refused to do likewise. The evidence further shows that later he talked to plaintiff's counsel about the article that had been published in the Lockwood Luminary. Mr. Caslavka was asked if he did not go to Lockwood and ask Berniece Coiner, who was then editor of the Lockwood Luminary, to publish as little as possible about Mrs. York's death after visiting the chiropractor's office. His answer was "To the best of my knowledge, Joe, I did not." He made the same answer to a similar question by the court. He was then asked if he remembered telling plaintiff's attorney that he had talked with the newspaper editor in Greenfield and asked him to publish as little as possible about it and had then gone over to the Lockwood Luminary and talked to Miss Coiner and said in reference to that interview, "Oh that paper, you couldn't do nothing with it." His answer was: "I do not, Joe."

Miss Coiner had sold her paper shortly after the death of plaintiff's wife and at the time of the trial was not in the newspaper business. She testified that she had no opinion prior to hearing the evidence, as to how the case should be decided. That the article she had written was based upon newspaper reports and upon rumor around Greenfield.

The court by overruling the motion for new trial, must have thought that at least one of defendant's counsel had full knowledge of the newspaper article, knew in advance that it was going to be written and ought not, with full possession of this information, be given a new trial without having specifically asked this juror in relation to the article on the voir dire examination.

The evidence further showed that Miss Coiner was well acquainted with all the attorneys for the defendant, that they were well acquainted with her, that two of them had represented her in matters and that she was not acquainted with the plaintiff or his attorney.

The trial court has a large degree of discretion in overruling or sustaining a motion for new trial and it is only when there is a clear abuse of such discretion that an appellate court will interfere.

Plaintiff's counsel should not be permitted to accept the juror about whom one of them has information of her alleged disqualification and then, when the results are unsatisfactory, ask for a new trial when a little diligence on their part would have completely developed the full facts. In Lemonds v. Holmes (Mo. App.) 236 S. W. (2) 56, 22 A. L. R. (2) 418, this court said:

"The law is well settled that diligence must be used in ascertaining the qualifications of jurors, that any matter within the knowledge of counsel or knowledge that might be acquired by the exercise of due diligence is considered as waived unless acted upon at the time. 50 C. J. S., Juries, Sec. 251, Page 1009; 66 C. J. S. New Trial, Sec. 23, Page 116; State v. Murray, 316 Mo. 31, 29 S. W. 434; Cook v. Kansas City, 358 Mo. 296, 214 S. W. (2) 430."

He may not speculate upon a favorable result by withholding his objection until after the verdict is returned, thus gambling on a favorable verdict, and then when the verdict is unfavorable, obtain a new trial on that ground. State v. Burns, 172 S. W. (2) 259, 351 Mo. 163.

We think there was no abuse of the court's discretion in overruling the motion for new trial on this ground and that this juror was not disqualified as a matter of law.

We have read and considered the many cases cited by industrious counsel for defendant but a discussion of them would unnecessarily lengthen an already long opinion.

It is our view that the judgment of the trial court should be affirmed. It is so ordered. *Blair* and *McDowell, JJ.,* concur.