Louis L. BATEMAN, Respondent,

v.

Henry E. ROSENBERG, M. D. Appellant.

No. 35436.

Missouri Court of Appeals,
St. Louis District,
Division Two.

May 13, 1975.

Motion for Rehearing or Transfer to Court
En Banc or Transfer to Supreme Court
Denied June 26, 1975.

Application to Transfer Denied
Sept. 8, 1975.

William R. Kirby, St. Louis, for defendant-appellant.

Thomas C. Hullverson, St. Louis, for plaintiff-respondent.

STEWART, Judge.

Louis L. Bateman, plaintiff, brought an action for the wrongful death of his wife, Ava, against Henry E. Rosenberg, M. D., defendant. The cause was submitted to the jury on the theory that defendant who had performed a tonsillectomy upon Mrs. Bateman had sent her "home under inadequate nursing supervision". Verdict and judgment were for plaintiff in the sum of $50,-000. Defendant appeals contending that plaintiff failed to make a submissible case

under the theory submitted; and that the court erred in giving the verdict directing instruction because there was no substantial evidence to support the charge. Defendant also charges that the trial court erred in overruling his objection to a hypothetical question.

■ In our review we must "consider the whole evidence, giving plaintiff the benefit of all facts and circumstances favorable to or tending to support his theory of the case with every reasonable inference that may be drawn therefrom, as well as any evidence offered by defendant, and such inferences as are favorable to plaintiff and we will disregard any of defendant's evidence contradictory or unfavorable to plaintiff's contentions." *York v. Daniels*, 241 Mo.App. 809, 259 S.W.2d 109 (1953).

Ava Bateman, 48 years of age, had been married to plaintiff, who was 70 years of age, since 1963. She was in good health except for tonsillitis for which she was being treated by defendant.

On June 15, 1970, between 8:30 and 9:00 a. m. Mrs. Bateman went to the office of defendant for a scheduled tonsillectomy. Defendant is a physician and surgeon engaged in the general practice of his profession. He is not on the staff of any hospital. He testified that his "work in tonsillectomy is as great as anyones." After a preliminary examination Ava Bateman was given Demoral and Valium and 45 minutes later at about 10:00 a. m. defendant performed a tonsillectomy. He used the Sluder instrument, which tends to cause more bleeding than other methods.

The patient was then taken to another room where she was put into a bed to recover and to await the arrival of her neighbor, Mrs. Peggy Brooks. Mrs. Bateman had arranged to have Mrs. Brooks come by the defendant's office at about 4:00 p. m. to take her home.

There was testimony by the defendant to the effect that the defendant or his office assistant, Bertha Monahan, looked in on Mrs. Bateman throughout the day. She was given "constant attention". Mrs. Monahan had no nursing training, her duties were to answer the telephone, file cards, clean and show patients to the examining room. Around 2:00 p. m. the defendant found Mrs. Bateman with her fingers in her mouth. There was blood on her fingernails and she was smoking. The doctor told her not to smoke. Mrs. Monahan testified that she looked in on Mrs. Bateman about one-half hour before Mrs. Brooks arrived, she saw nothing unusual.

When Mrs. Brooks arrived at 4:00 p. m. Mrs. Monahan took her to Mrs. Bateman. Mrs. Bateman was lying on the bed face down. Mrs. Brooks raised her head to find her face covered with blood. There was blood in her hair and the bed was full of blood. She wiped the blood from Mrs. Bateman's face and took her to the bathroom where she threw up blood, approximately a glass full. The door to the bathroom was open. As she came out of the bathroom the doctor was standing by the door. He handed Mrs. Brooks a bottle of Riopan and told her to give Mrs. Bateman two teaspoons when she got home. Riopan is an antacid and stomach sweetener. He also told her to place an ice pack on the throat and that he would send some additional medicines. No other instructions were given. Mrs. Bateman seemed groggy and made no response. No inquiry was made as to Mrs. Brooks' background or experience with persons who were ill or recovering from surgery. Mrs. Monahan helped Mrs. Brooks take Mrs. Bateman to the car where Mr. Brooks was waiting. The two women got into the rear seat. When they got to the Bateman home Mrs. Brooks took Mrs. Bateman upstairs and put her into bed. Riopan was administered and an ice pack was placed on Mrs. Bateman's throat.

Mrs. Brooks had merely volunteered to take Mrs. Bateman home and when she had to go home to prepare the family meal she called Mrs. Vivian Cadle, the downstairs neighbor, who volunteered to stay with

Mrs. Bateman until Mr. Bateman came home. Mrs. Brooks told Mrs. Cadle of the instructions given by defendant.

When Mrs. Cadle arrived Mrs. Bateman was in bed lying on her back making loud noises "she was like snoring, loud noises." On one occasion there was some blood in her mouth and she appeared to want to spit up. Mrs. Brooks and Mrs. Cadle brought her a bucket and attempted to hold her up. Mrs. Bateman could not spit up, and she fell back into bed on her back and continued to make the sounds which the witnesses had described. Mrs. Brooks then went home.

The drugs ordered by defendant came about 6:00 p. m. They consisted of a local antiseptic, a cough medicine compound, neither of which would stop bleeding, and vitamin K. The latter is of very speculative value in stopping bleeding. Mrs. Cadle did not administer any of the drugs. Mrs. Bateman was apparently asleep.

Mr. Bateman came home from work about 6:30 p. m. He spoke to his wife but got no response. She did not make a sound. Mrs. Cadle related the instructions she had received from Mrs. Brooks. After Mr. Bateman got some more ice, he touched his wife who felt cold and made no response. He called his sister who called the police who in turn took Mrs. Bateman to the hospital, where she was pronounced dead.

The cause of death was determined to be asphyxia or strangulation due to blood in the bronchial tree and edema or swelling of the glottis. The swelling was the result of the surgery; the bleeding, blood loss and inability to breathe.

Other facts necessary to our determination will be stated where appropriate.

■ Plaintiff having submitted his case on the theory that defendant had sent his wife home "under inadequate nursing supervision" has abandoned other pleaded charges of negligence and can recover only if there is substantial evidence to support the charge submitted. *Hampton v. Loper,* 402 S.W.2d 825 (Mo.App.1966).

■ The surgeon's obligation to the patient is not discharged with the conclusion of a successful operation. Unless terminated by the parties, his relationship to the patient " . . . continues until ended by . . . the cessation of the necessity which gave rise to the relation, and the surgeon must not only use reasonable and ordinary care and skill in performing the operation, but during the continuance of the relation of physician and patient exercise ordinary diligence in the subsequent treatment and give, or see that the patient is given, such attention as the necessity of the case demands." *Reed v. Laughlin,* 332 Mo. 424, 58 S.W.2d 440 (1933). Where the doctor knows or should know that a condition exists which requires continuous or frequent expert attention to prevent injurious consequences he must render that attention or see that some other competent person does so. *Jackson v. Burton,* 226 Ala. 483, 147 So. 414 (1933). It thus follows that if the doctor is unable to personally attend a person under such circumstances it is incumbent upon him to see that those persons who are to be in nursing attendance upon the patient are competent to perform those services or to give them such instruction as will enable them to competently look after and care for the patient.

■ Defendant agreed with the plaintiff's two expert witnesses that the greatest danger in a tonsillectomy is bleeding. Along with bleeding there is the danger of strangulation. The critical period is the first 24 hours following the operation. Dr. Rosenberg testified that the patient should be positioned on her side so that she could "slobber", that is bring up anything in the mouth. This prevents swallowing and consequent "trouble". Defendant in recognition of the standard of care required of him testified that he had given Mrs. Brooks instructions to position Mrs. Bateman on her side or on her stomach with her head to the side. Mrs. Brooks testified that Dr. Rosenberg did not instruct her with respect to positioning Mrs. Bateman. Whether de-

fendant gave the instructions was for the jury to determine. The jury could well have found from defendant's testimony that he should have given those instructions and from the testimony as a whole that he did not.

Mrs. Brooks had no nursing experience or training and no attempt was made by the defendant to determine whether she was capable of looking after Mrs. Bateman, absent adequate instructions. The doctor had never spoken to Mr. Bateman and admitted that he had made no inquiry whatever concerning his patient's husband.

Testimony on behalf of defendant was to the effect that Mrs. Bateman had "constant attention" throughout the day. Defendant admitted seeing Mrs. Bateman's fingernails full of blood at 2:00 in the afternoon. The jury was free to find that she had suffered extensive bleeding just before she went home, her face and the rubber sheet she was lying on were covered with blood. With "constant attention" defendant should have been aware of this condition. Defendant was in the room in which the bathroom was located when Mrs. Bateman went into the bathroom and threw up about a glass full of blood. The bathroom door was open. It was right after this that defendant provided Riopan to settle her stomach. From the evidence the jury could infer that defendant was aware of the fact that Mrs. Bateman had vomitted.

The jury could find from the facts that defendant knew that Mrs. Bateman required competent nursing care; that he released Mrs. Bateman to go home without ascertaining that Mrs. Bateman would be adequately supervised and without giving Mrs. Brooks instructions that would permit her and those who would relieve her to give Mrs. Bateman adequate nursing supervision.

■ The jury was also warranted in finding that the death of Mrs. Bateman by strangulation by reason of blood in the bronchial tree and the swollen glottis was a natural consequence of defendant's failure to see that Mrs. Bateman received adequate nursing supervision. As noted above defendant recognized that strangulation could result from bleeding particularly were the patient not properly positioned. We conclude that there was sufficient substantial evidence to submit this case to the jury.

■ In as much as there was sufficient evidence to make a submissible case on the single theory submitted in plaintiff's verdict directing instruction it necessarily follows that there was sufficient evidence to support the giving of the instruction. .

Defendant complains that there was no standard of "acceptable practice of 'adequate nursing supervision'" established by expert testimony.

■ It is the general rule that expert medical testimony is ordinarily necessary to establish what constitutes due care and skill under the circumstances of a particular case. *Hart v. Steele*, 416 S.W.2d 927 (Mo. 1967). However expert medical testimony is not always essential in order to make a jury issue in a malpractice case, defendant's own testimony may be taken as establishing the standard of care required. *Richeson v. Roebber*, 349 Mo. 132, 159 S.W.2d 658 (1941). In this case, as was said above, the defendant himself established the standard of care required. He gave testimony as to the proper positioning of the patient so that any bleeding would be expelled from the mouth and thus prevent swallowing of blood which could lead to strangulation.

Defendant in arguing that the standard was not established, or more precisely, to establish that his instructions were adequate refers us to the cross examination of Dr. Cutler one of plaintiff's expert witnesses. We quote from defendant's brief:

"This witness on cross-examination was asked by defendant's counsel a hypothetical question (T. 136,137) that included the following as to post-operative instructions and nursing care (T. 137):

'She had been warned not to smoke, and that the lady who came to pick her

**758**

up was to stay with her, and that some medication would be sent by a pharmacy, and to follow the directions on the medication.

And that the lady then went home under these conditions.

Doctor, if these instructions were followed, isn't that essentially what this lady would have gotten in the hospital? A. According to what you have said, is adequate. The only difference in the care is that in the hospital she would have been under trained care and trained personnel. That's the only difference.'

Thus the above expert witness confirmed the adequacy of defendant's instructions to the deceased upon being released to go home."

A reading of the entire hypothetical question reveals that Dr. Cutler was also asked to take into consideration, as a fact, that Mrs. Brooks was instructed: "That she [Mrs. Bateman] should be watched and should be kept off of her back and on her side or stomach with her head to the side."

■ If independent expert testimony was necessary to establish the standard of care it was established by Dr. Cutler's answer to the hypothetical question propounded by defendant.

■ Defendant contends that the trial court erred in overruling his objection to the hypothetical question propounded to Dr. Cutler. This matter was not preserved for our review in the motion for a new trial. *Glassburner v. Burtrum,* 418 S.W.2d 119, (Mo.1967).

The judgment of the trial court is affirmed.

SMITH, C. J., and KELLY, J., concur.