Elvin R. PEINE, Jack Peine, Charles A. Peine, Mary Skates, and Madeline Turner, Heirs of Nancy B. Thomas, deceased, and Elvin R. Peine, Administrator of the Estate of Nancy B. Thomas, deceased, Respondents,

v.

Missouri Jane Alice SATER, Appellant.

No. 44878.

Supreme Court of Missouri.

Division No. 1.

April 9, 1956.

Charles M. Wantuck, Springfield, for respondents.

COIL, Commissioner.

Nancy B. Thomas sued her sister, Mrs. Alice Sater, to cancel a warranty deed executed by plaintiff on February 8, 1954, which conveyed real estate in the City of Springfield to Mrs. Sater. While the case was under submission, Nancy B. Thomas died and, on motion, her administrator and heirs were substituted as parties plaintiff. The trial court's judgment canceled the deed and appellant, defendant below, has appealed from that judgment. We shall refer to the parties as they were designated in the trial court, and "plaintiff" herein will designate the original plaintiff, Nancy B. Thomas.

Plaintiff's petition sought cancellation of the deed on the grounds that it was executed and delivered at a time when plaintiff was of unsound mind, that it was procured by the undue influence of defendant, and that there was no consideration for the deed.

In reviewing this equity case, we have in mind these well-fixed rules and principles: We weigh the evidence and arrive at our own conclusions as to its weight, taking into account the trial chancellor's position to judge the credibility and characteristics of the witnesses who testified before him; the burden was and is on plaintiff to prove by convincing evidence the existence of one or more of the alleged grounds upon which cancellation was sought; and cancellation of a deed is the exercise of a most extraordinary power of a court of equity and a power to be exercised only where the evidence tending to justify cancellation is convincing. McCoy v. McCoy, 360 Mo. 199, 205 [2] [3], 227 S.W.2d 698, 703 [2] [3, 4].

Plaintiff, a widow 74 years of age, lived in a 4-room house, immediately to the rear of which was a separate 2-room house, both of which plaintiff owned prior to the execution of the deed in question. She apparently had no income other than a $50

Barbour & Patterson, Springfield, for appellant.

monthly pension from the state. The evidence was clear that for at least two to four years prior to the execution of the deed, plaintiff suffered various illnesses and afflictions, including a weak heart, asthma, syphilis, and a kidney disturbance. The testimony of all the witnesses who testified on the subject, both for plaintiff and defendant, except that of the defendant herself, established the fact that during the months of January, February, and March, 1954, plaintiff was very ill and in "bad shape," at least from a physical standpoint. There was, however, as we shall hereinafter indicate more fully, a dispute in the evidence as to plaintiff's mental condition during the three-months' period and more specifically on February 8, 1954.

Dr. E. Allen Pickens, who had been plaintiff's physician for at least five years prior to February 1954, but who had not seen plaintiff after July 1953, described her as one who had become senile due to deterioration accompanying age and who was suffering from a weak heart, asthma, syphilis, and a kidney ailment. He had examined laboratory records reflecting tests made of plaintiff which showed that plaintiff's syphilis had affected her central nervous system which would cause a softening of the brain, the effect of which would be to "slow up her thinking." In June 1953, Dr. Pickens had prescribed for plaintiff medicine in tablet form which contained ephedrine and amytal and had arranged with the pharmacist at the drugstore at which the prescription was filled that the doctor be called for an "O. K." each time the prescription was presented for refilling. That prescription, calling for 24 tablets, had been filled 12 times between June 1953 and February 2, 1954. It was refilled on February 1, 1954, and on February 2, 1954. The medicine prescribed was specifically for asthma. It had the effect of quieting the patient and permitting her to breathe more freely. The doctor said that, while the medicine had no permanent deleterious effect on the brain, when it was taken by one who was suffering from softening of the brain, one's mental ability to think clearly would be seriously affected. He described the effect of the amytal as about the same as the effect of medicine known as "twilight sleep" and said that, while it did not change the anatomical structure of one's brain, nevertheless it would derange one's thinking. It was the opinion of Dr. Pickens, as we understand, that plaintiff's senile condition, which he said was progressive, plus the physical ailments heretofore described and the effect of the asthma medicine on her, made her incompetent during the first part of 1954 to handle her affairs or to appreciate the nature and extent of her property, and that one in plaintiff's condition would be unusually susceptible to influence by others.

A witness, apparently an investigator or case worker for the Department of Health and Welfare, who visited plaintiff on February 1, 1954, testified that at that time plaintiff was very ill, extremely nervous, and in a state of hysteria because of a certain "problem confronting her" (the witness did not state the nature of the problem, claiming she was not permitted to do so because of the provisions of Section 208.120 RSMo 1949, V.A.M.S.), and that plaintiff was incoherent in her speech.

A public health nurse testified that in her opinion plaintiff was not mentally competent in August 1954 when she observed her while plaintiff was being treated for syphilis.

Plaintiff's son, who lived in the 2-room house on the same lot in which his mother's house stood but who was living with his mother during the first part of February 1954, testified, in effect, that the asthma pills caused his mother to be unable to handle her affairs in February 1954, and he described certain actions on his mother's part which may have indicated some mental derangement at the time. He testified further, however, that when his mother was taken to a rest home in July 1954, and discontinued the asthma pills, she seemed all right mentally thereafter. The witness's daughter, 11-year-old Wanda, had lived most of her life in the house with plaintiff, her grandmother. The witness stated that his daughter did the housework, including the cooking and shopping for groceries. He and Wanda said the asthma pills had

to be hidden to prevent plaintiff taking too many.

Frances Peine, plaintiff's daughter-in-law, was of the opinion, based on a short visit with plaintiff in March 1954, that at that time plaintiff could not understand the nature of any business affairs, and related her conversation with plaintiff upon which she based that statement.

Plaintiff, unable to attend the trial because of her physical condition, testified in her home that, while she thought she was as good mentally in January, February, and March, 1954, as she was at the time of trial (December 1954), she was taking the asthma pills and she said, "Well, it seems as though, when you have got an asthma pill, the world is yours."

Defendant's evidence with respect to the physical and mental condition of plaintiff which might bear on her condition on February 8, 1954, adduced by neighbors and friends, was that plaintiff was normal mentally in December 1953; that she was normal mentally at some unfixed time during the period January, February, and March. However, those same neighbors said that plaintiff was sick, and was worse in January, February, and March, 1954.

Defendant's son-in-law testified that while plaintiff was seriously ill in January, February, and March, 1954, manifested by a nervous condition and inability to breathe, she was sane on February 1, 1954, and that there had been no material change in her mental condition in the past year.

Defendant's daughter-in-law testified that while plaintiff was sick with heart trouble and asthma, her mental condition was all right and that she was able to handle her affairs in February 1954, and that the asthma pills assisted plaintiff's breathing but did not affect her mentally.

A clerk from the grocery store where plaintiff traded until July 1954 testified that on occasions witness delivered groceries to plaintiff, and that plaintiff was sick during the first part of 1954 but was all right mentally although the witness was unable to fix the times of her visits.

Defendant testified that her sister had had asthma and heart trouble for three or four years prior to the trial, but that it was not true that plaintiff was "pretty sick" during January, February, and March, 1954; that plaintiff was at all times mentally competent and was possessed of a good memory.

We now examine the evidence pertaining to the execution of the deed. Plaintiff testified that if she signed the warranty deed in question, she did not intend to do so; that she does not remember having done so; that if she ever gave away her property, she wanted to give it to her granddaughter, Wanda, who had always taken care of her and kept house for her; that she remembered the time a lawyer visited her house when her sister, the defendant, was there (the time when the deed was executed), but that so far as she was concerned all that happened was that they talked awhile and the lawyer left. Plaintiff categorically denied that she ever discussed or made any arrangement with defendant such as the one defendant testified was the agreement upon which the deed was based (referred to hereinafter) and denied that the defendant had ever paid any taxes on the property, as defendant contends, in 1939 when plaintiff apparently acquired it from her husband. Plaintiff testified that she knew there was a sewer tax bill which was past due and it worried her; that, apparently in July 1954, she asked her son Elvin to arrange to pay that bill; that when they attempted to locate the deed and other papers relating to the property, they couldn't find them; and that as a result of her son's investigation, it was discovered that the deed to defendant had been placed on record.

Plaintiff's son, Elvin, testified that in July 1954 plaintiff mentioned that the special sewer tax bill was past due and asked him to arrange a loan at the bank with which to pay it; that he went to the bank and the banker told him the loan would be made if the title to the propery was in order, and requested that witness bring to the bank the abstract and deed; that he asked plaintiff where the abstract and deed were and plaintiff replied that the defendant had them

—that she (defendant) was keeping her papers, including the deed and her insurance policy; that witness discovered through another that defendant denied having the papers or any knowledge of them; that he intended to have a new abstract of title made when he discovered the fact that the deed in question had been recorded.

Defendant, who was a practical nurse and housekeeper, lived close to plaintiff (four houses away) and described the transaction culminating in the execution of the deed. She testified that some time· during the winter of 1953–54 plaintiff expressed concern over the possibility that her home would be sold because of the past due special tax bill; that about that time defendant had an offer to work for the Karbinskys which· would necessitate her living on her prospective· employer's premises; that when she mentioned that offer plaintiff objected to defendant's accepting and said that if defendant would refuse the offer, she (plaintiff) would see that defendant was paid, and in that connection proposed that if defendant would "redeem her house again" (defendant claimed that in 1939 she had voluntarily paid some taxes on plaintiff's house) so that plaintiff would have a home, she, plaintiff, would deed the place to defendant. Defendant testified that such an idea was plaintiff's and that defendant did not suggest such an arrangement. Defendant said, however, that she still thought it would be best not to do anything about the matter, but that plaintiff insisted that they go to town and see a lawyer; that on a certain day, apparently February 7, 1954, plaintiff, in company with her granddaughter Wanda, went to defendant's daughter-in-law's house (the second house from plaintiff) and sent Wanda to tell defendant that plaintiff wanted to go to a lawyer's office. As a result, defendant, together with plaintiff and Wanda, departed for Lawyer Wyatt's office. · (Defendant's daughter-in-law corroborated defendant's testimony as to plaintiff and Wanda coming to her house and as to the fact that the three thereafter boarded a bus to go uptown. The witness did no know where they were going or for what purpose.)

Defendant · said that plaintiff had suggested Lawyer Wyatt; that when they arrived at his office, Mr. Wyatt's secretary informed them that he would be busy until five o'clock; and that plaintiff suggested she could not wait because of her kidney condition. They then proceeded to the Community Building to see Lawyer Parrish. A note on his door explained he would return in a few minutes. Plaintiff said, "I * * * can't * * * climb those steps again [apparently the law office involved was on a second floor] * * *. And I want you to come by there, as you come from work, and leave the papers with him and let him fix them. And see if he will come out to the house." Plaintiff, defendant, and Wanda returned, apparently to plaintiff's home, and there plaintiff gave defendant the old deed which purportedly contained the description of plaintiff's property. The next day defendant went alone to the Parrish office, explained to him that her sister wanted to deed to defendant the property described in the deed which she handed him, and made arrangements for Mr. Parrish to prepare a deed and bring it to plaintiff's home the following afternoon. Mr. Parrish did bring the deed the next day to plaintiff's home, where defendant was also present, read the deed to plaintiff, explained it to her, and asked her why she wanted to deed the property to defendant, to which plaintiff replied, "If it hadn't been for Doll [the name by which defendant was known in the. family], I would have starved to death because· there wouldn't none of the rest of them do anything for me." Defendant explained that she had told Mr. Parrish in his office of the previous visit of plaintiff, defendant, and Wanda; that at the time the deed was signed by plaintiff, plaintiff's mental condition was all right; that she had not taken any medicine because she was out and did not have any; and that Mr. Parrish was paid by plaintiff, defendant taking some money from a tobacco sack which plaintiff kept and handing it to Mr. Parrish. Defendant said that plaintiff understood what she was doing, both at the time of the trip and at the time she signed the deed; that her mental faculties and memory were good, although she did say that on one undated

occasion plaintiff thought she saw her (plaintiff's) coffin and wanted defendant to see if she also could see it.

After the deed was handed to defendant, defendant said, "We went over to the south side to the dime store, and got her a pair of glasses, and bought some things for Wanda, and then came home. We shopped." Thereafter defendant had the deed recorded (the deed showed that it was recorded on February 17, 1954.) Defendant further said that plaintiff suggested to defendant that she not say anything about the deed to anyone because "he" (apparently referring to plaintiff's son Elvin) would give plaintiff a "good cussing over it." Defendant mentioned the deed to no one except her daughter-in-law. Defendant also said that she had never received any inquiry concerning the deed from any member of plaintiff's family; that plaintiff herself had never asked her to reconvey the property although plaintiff's instant counsel had made that request. Defendant conceded that her sister, the plaintiff, was quieter after they took her to a rest home in July 1954, because there she was not nervous on account of the children upsetting her.

Defendant testified on cross-examination that the deed was given to her in consideration of money plaintiff owed her for past advances and services. As heretofore indicated, defendant claimed that she voluntarily, so far as the evidence shows, paid a tax bill against plaintiff's property some time in 1939, and that since that time she had voluntarily rendered services for plaintiff in the way of taking food to her, cleaning her house, laundering, making beds, etc. On redirect examination, defendant said that the deed was also given in consideration of her agreement to continue to take care of her sister in the future, not to take the Karbinsky job, and to pay off the past due tax bill in the sum of $214. Defendant paid no cash to plaintiff for the deed. (The value of the property involved was not shown.)

Defendant's testimony that she had paid a tax bill in 1939 on plaintiff's property was denied by plaintiff and no corroboration of any such payment was adduced. The evidence showed further that defendant did not take the Karbinsky job but in or prior to July 1954 defendant took another job which made it necessary that she be away from her home and thus not in a position to take care of her sister daily and that defendant had never paid the sewer tax bill but had "extended" it for one year. Defendant also testified, as we understand it, that part of her agreement with plaintiff was that plaintiff was to live in the property involved for the rest of plaintiff's life. The deed executed was a general warranty deed which did not reserve a life estate and in which plaintiff warranted the title free and clear of all liens with no reservations as to past-due taxes of any kind.

As we have heretofore indicated, plaintiff denied that she ever went to any lawyer's office with defendant. She testified that defendant had the old deed because defendant was keeping it for her along with plaintiff's other papers. Wanda, the granddaughter, also denied that she had ever gone to any lawyer's office in company with either plaintiff or defendant.

We here point out that the evidence is clear that defendant did, through the years, render sisterly assistance to plaintiff in the way of bringing in food, doing laundry, cleaning plaintiff's house, etc. The extent and frequency of these services is somewhat disputed, but, as we see it, it is of little importance for the reasons which will appear. It is also clear from the evidence that plaintiff trusted defendant, had confidence in her, and depended on her to a great extent to assist plaintiff in handling minor matters, such as paying insurance premiums and, at times, grocery bills. It is also well established by the evidence that the granddaughter rendered much assistance to her grandmother in the way of keeping house, cooking, and running errands.

Mr. Parrish, the lawyer who drew the deed, testified that defendant consulted with him in February 1954 and told him that she wanted him to write a deed for her sister. (Mr. Parrish had never seen plaintiff.) Defendant supplied the old deed containing the description of the property which de-

fendant said plaintiff wished to convey. (As a matter of fact, the description contained in the deed as drawn described Lot 654 and part of Lot 663 in Block 28, which plaintiff did not own, as well as Lot 652 in Block 28 which plaintiff did own, and which is the real estate in question.) Nothing was said to Mr. Parrish by defendant about reserving a life estate for plaintiff or about excepting from the warranty of title any taxes due, special or general. Mr. Parrish copied the description from the old deed and, on defendant's explanation that her sister was unable to climb the stairs to his office, arranged to drop by plaintiff's house on his way home. He thought it was the same afternoon of defendant's call. He said he stayed for 15 or 20 minutes and obtained plaintiff's signature. He said that he read parts of the deed to plaintiff and saw nothing to indicate that plaintiff was not a fairly intelligent woman for her age and that, prior to signing the deed, plaintiff said she wanted to sign it because defendant had been good to her.

The evidence convinces us: that plaintiff was physically ill at the time of the execution of the deed; that irrespective of her mental capacity at that time from the standpoint of sound or unsound mind, her mental processes, affected as they must have been by the medicine which she was then and had been taking frequently for a long time and by her syphilitic condition involving her central nervous system, were such as to make it highly questionable whether she did, on February 8, 1954, have the mental capacity to realize the force and effect of the deed which she executed, or to understand the nature of the transaction; that, in any event, her mental and physical condition was then such as to make her easily susceptible to the influence of another and particularly to the influence of a trusted sister. And we defer to and accept the trial court's finding contained in a memorandum opinion that defendant was "a woman of far superior intellect to the plaintiff, and a woman of forceful and aggressive character."

In view of the foregoing, which we have said has been proved convincingly, what of

defendant's account of the matters leading up to and culminating in the execution of the deed? Defendant by her own testimony must have known of her sister's physical and mental condition which we have heretofore described. She knew that plaintiff relied on her for assistance and advice. Yet defendant says that plaintiff, a pensioner, offered to convey to defendant plaintiff's home (her only substantial possession) if defendant would refuse to take a proffered position, provide that plaintiff could reside in the home for her remaining days, pay the sewer tax bill against the property, and continue to care for plaintiff. If that offer was made by plaintiff and accepted by defendant, it seems strange indeed that defendant did not tell the lawyer (for whom she arranged) anything to indicate the conditions under which the property was to be transferred. If she had, certainly a deed or other papers which would have given effect to those conditions would have been prepared.

While plaintiff, who testified that she did not remember signing any deed, may likewise not have remembered a trip to the offices of two lawyers (which she denied), yet there is the testimony of Wanda, the grandchild, who defendant says accompanied plaintiff and defendant on that trip, denying any recollection thereof. In the absence of some indication by the trial chancellor suggesting that Wanda's demeanor as a witness was such as to cast doubt on her credibility, we are unable to accept defendant's premise that Wanda's testimony in that respect is entitled to no weight on the ground that she, as a witness, was the "pawn" of her father.

Defendant said plaintiff was not taking "asthma tablets" on the day the deed was executed because, defendant said, plaintiff had run out of them. Yet the record shows that plaintiff had been frequently and regularly taking those tablets and that six days before February 8th she had obtained 24 tablets and five days after the 8th she had obtained an additional 24 tablets. No reason appears as to why plaintiff would for some short period (e. g., February 8) between February 2 (when the prescription was refilled)

and February 13 (the next refill date) suddenly stop the consumption of the medicine she had been taking before and after the date on which the deed was executed. We think the convincing inference is to the contrary and that the most reasonable conclusion is that plaintiff was under the influence of the amytal on the day the deed was executed.

Then there is the significant circumstance that defendant, after she received the deed, did not perform a clearly implied part of her bargain, viz., not to take a position which would make her constant assistance to plaintiff impossible. On the contrary, defendant took a position which made it necessary to place plaintiff in a rest home (at plaintiff's expense, although defendant "guaranteed" payment of the charges) so that she could receive proper care—care which, according to defendant, she was to render to plaintiff.

It is also significant, we think, that defendant was the only witness who testified that plaintiff was not "pretty sick" during January, February, and March, 1954. All the others, both plaintiff's and defendant's witnesses, agreed, in effect, that plaintiff was seriously ill during those months, even though some said that she was mentally normal. Yet defendant said that after the deed was executed plaintiff went shopping for a pair of glasses.

The trial court was convinced that the deed in question was the result of defendant's undue influence even "without considering any of the disputed testimony." We think, however, that the trial court could not very well have found that defendant exerted undue influence upon plaintiff without having rejected, to a large extent at least, the testimony of the defendant; for essentially the case must turn, as we see it, upon whether defendant's testimony is accepted or rejected. Be that as it may, however, our independent examination of the entire record forces us to reject the salient features of defendant's account of the circumstances under which the deed was executed and delivered.

Once defendant's version of the transaction is rejected the only reasonable conclusion is that defendant had the deed prepared, without plaintiff's prior knowledge and had it signed by plaintiff at a time when defendant knew or should have known that plaintiff would do as defendant suggested. And this conclusion is fortified by plaintiff's testimony that she did not intend to deed the property to defendant, had no arrangement therefor, and her statement that if she ever gave away her home she would give it to her granddaughter Wanda, who had lived with plaintiff and had taken care of her.

Defendant relies upon the testimony of Mr. Parrish, the lawyer who drew the deed. As noted, Mr. Parrish testified that he explained the deed to plaintiff and that she indicated she understood it, wanted to sign it, and gave no indication that she was not a reasonably intelligent person. In the view we have taken of defendant's account of the transaction, we cannot attach decisive significance to Mr. Parrish's testimony. This, because once the conclusion is reached that defendant, not plaintiff, was the moving force in the matters connected with the deed, then it follows that Mr. Parrish's knowledge of the entire matter was gained from the representations defendant had made to him in the absence of plaintiff; he did not know plaintiff, knew nothing, so far as the record shows, of the nature and extent of plaintiff's diseases and afflictions and knew nothing of the fact that plaintiff had been and was taking medicine which affected her ability to exercise judgment and which plaintiff said made her feel as if "the world were hers." Under all the circumstances, his answers, although truthful, based as they were upon so limited a knowledge of the situation, were not decisively significant.

Defendant's theory as exemplified in her brief is that plaintiff conveyed the property to defendant willingly and in accord with her uninfluenced wish and desire; that the instant suit was instigated by plaintiff's son, without the knowledge or desire of plaintiff, with the motive to cancel plaintiff's deed so that he would be in a position to receive the property at his mother's death. There can be little doubt that plaintiff's son was instrumental in arranging for the

present suit. It is also true, however, that while plaintiff at one point in her testimony indicated that she knew nothing of the suit until after it was filed, testified positively that she told her instant counsel that she was most anxious to regain her property. And if plaintiff's deed should have been canceled, her son's actions in assisting her in accomplishing cancellation were justified. Furthermore, the result of this case cannot depend upon the son's motives in assisting his mother, but rather must depend upon whether we are convinced by all the circumstances that the deed was in fact not the independent act of plaintiff but was the result of defendant's actions which had the effect of substituting defendant's will for that of plaintiff's.

 It is not essential that undue influence be proved by direct evidence. It may be proved by facts and circumstances. "But 'such facts and circumstances must from their nature, at least, savor of some act which by reasonable construction [may] be held to indicate a purpose on the part of the proponent to gain some advantage * * * which would redound to her own pecuniary benefit.' Bushman v. Barlow, 316 Mo. 916, 292 S.W. 1039, 1051. 'It must not rest on mere opportunity to influence, or on mere suspicion. There must be somewhere proof of undue influence itself, either in fact or presumptively. * * * It must not be merely the influence of natural affection.' Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S.W. 46, 51. The undue influence must 'rise to the mark of such overpersuasion, coercion, force * * * or deception, as breaks the will power of testator and puts in its stead the will of another.' Webster v. Leiman, 328 Mo. 1232, 44 S.W.2d [40] loc. cit. 43." Manahan v. Manahan, Mo., 52 SW.2d 825, 827 [1–6]. And the physical and mental condition of plaintiff at the time the instant deed was executed are highly important factors to consider on the question of undue influence.

Taking into account the physical and mental condition of plaintiff on February 8, 1954, as we have found it to have been, considering the activity of defendant

relating to the execution of the deed, the pecuniary benefit she derived from the conveyance, the fact that the deed was, according to defendant, supposed to have been the culmination of an "arm's length" transaction as opposed to a gift based upon love and affection, and after a careful examination of the entire record, we are convinced that the deed was not in fact plaintiff's deed but was procured by defendant as a result of defendant's influence upon plaintiff which rose to the mark of such overpersuasion as to amount to the substitution of defendant's will for that of plaintiff's.

The judgment is, therefore, affirmed.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.