Margaret **LISTERMAN** and John W. Listerman, Plaintiffs-Respondents,

v.

**DAY AND NIGHT PLUMBING AND HEAT-ING SERVICE, INC.,** Defendant and Third-Party Plaintiff-Respondent,

and

**EMPIRE SHEET METAL COMPANY,** a corporation, Third-Party Defendant-Appellant.

No. 8314.

Springfield Court of Appeals.

Missouri.

Nov. 13, 1964.

White, Dickey & Skelton, Springfield, for third-party defendant—appellant.

Neale, Newman, Bradshaw, Freeman & Neale, Springfield, for defendant and third-party plaintiff—respondent.

William A. Wear, Springfield, for plaintiffs—respondents.

STONE, Judge.

Plaintiffs, John W. Listerman and Margaret Listerman, husband and wife, sued Day and Night Plumbing and Heating Service, Inc. (hereinafter called Day and Night), for damage to plaintiffs' 1½-story frame dwelling house at 1925 West Lee Street, Springfield, Missouri, by reason of a fire on October 20, 1962, alleged to have resulted from negligence in the installation of a "free-standing fireplace heater." By leave of court, Day and Night, as third-party plaintiff, filed its third-party petition against Empire Sheet Metal Company, a corporation (hereinafter called Empire), as third-party defendant, predicated on Empire's alleged obligation to indemnify Day and Night for whatever sum the latter might be required to pay plaintiffs and for attorneys' fees in defending against plaintiffs' claim. In due time, the case was tried by the court sitting as a jury, with plaintiffs proceeding on their original petition against Day and Night, as sole defendant, and with Day and Night at the same time proceeding on

its third-party petition against Empire, as third-party defendant. The court's judgment (1) found the issues for plaintiffs on their petition, assessed their damages at $1,250, and adjudged recovery thereof from Day and Night, (2) found the issues for Day and Night on its third-party petition, assessed its damages at $1,250 and the additional sum of $250 as attorneys' fees, and adjudged recovery thereof by Day and Night from Empire, and (3) taxed all costs against Empire. Its timely motion for new trial having been overruled, Empire has perfected this appeal "from the judgment entered in this action." Neither plaintiffs nor Day and Night filed a motion for new trial or notice of appeal; and counsel here agree that Day and Night has satisfied the judgment obtained by plaintiffs on their petition.

Plaintiff Margaret[1] purchased the "free-standing fireplace heater" from Sears Roebuck and Company in April 1962 and shortly thereafter the heater, knocked down and packaged, was delivered to the Listerman home. Sears furnished a 12-page booklet (hereinafter referred to as Sears' instruction booklet), containing precise and detailed instructions for installation of the heater; and, at the same time, Sears recommended Day and Night as an independent installer. Pursuant to that recommendation, plaintiff contacted James A. Raney of Day and Night; and, after discussion of the proposed installation, Raney stated (so plaintiff testified) that "he would contract the job" and she said that she "would trust him to put it in for [her]—he would know what to do" and delivered Sears' instruction booklet to him.

▉▉▉ The eight-inch insulated flue pipe from the heater was not to be vented into a

chimney but was to run vertically through the first-floor ceiling, through an attic space, and out through the roof; and, knowing that "it would take a sheet metal man to do that work," Raney "engaged Empire to do the work for us." In paragraph 2 of its third-party petition, Day and Night alleged that it "employed the third-party defendant [Empire] as *an independent subcontractor* for the purpose of making said installation"; and, in its answer to the third-party petition, Empire admitted the quoted allegation. (All emphasis herein is ours.) The undisputed evidence was that Empire's employees installed the heater, the insulated flue pipe, and the rectangular metal casing around the flue pipe between the fireplace unit and the first-floor ceiling where the pipe otherwise would have been open to view and also above the roof where the pipe otherwise would have been subject to the elements, and that no employee of Day and Night participated in, or was present during, the installation by Empire. In short, both the pleadings and the evidence established that Empire's legal status with respect to the installation was that of an independent subcontractor within the contemplation and meaning of the widely-accepted definition that "[a]n independent contractor [or subcontractor] is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking."[2]

The flue pipe supplied with the heater was 24-gauge galvanized pipe completely insulated with fiberglass, one inch in thickness, held in place around the pipe by "a chicken-wire mesh." But the pipe furnished with the heater only reached about

1. All references to plaintiff in the singular are to plaintiff Margaret Listerman. For reasons disclosed in the record but here immaterial, her husband, John W. Listerman, did not appear at the trial.

2. Restatement, Second, Agency § 2(3); Madsen v. Lawrence, Mo., 366 S.W.2d

413, 415(3); Talley v. Bowen Const. Co., Mo., 340 S.W.2d 701, 704(2); Skidmore v. Haggard, 341 Mo. 837, 110 S.W.2d 726, 729(5); Barnes v. Real Silk Hosiery Mills, 341 Mo. 563, 108 S.W.2d 58, 61.

twelve to eighteen inches above the first-floor ceiling, so Empire prepared and set additional 4-foot sections of pipe which extended upward through the attic space and roof and to the top of the upright metal casing, about 5½ feet above the level at which the casing was attached to the roof. However, the top of the metal casing still did not extend above the ridgepole, because the pitch of the roof was "very steep."

Installation of the heater and flue pipe was completed by Empire in August 1962, after some unavoidable delay incident to preparation of the fire brick base by a firm not identified in the transcript. Before using the heater, plaintiff called Raney of Day and Night and "asked him for an inspection"; and, after he had "looked it over real good," Raney told plaintiff that "the job looked all right to me." On October 20, 1962, plaintiff burned some paper and empty milk cartons in the heater, that being (so she said) the first fire in it. Soon after that fire was started, a neighbor notified plaintiff that the "roof was smoking." The fire department responded to plaintiff's call; but, before the fire was extinguished, a hole some "six feet square or bigger" (hereinafter referred to simply as the hole) had been burned through the roof, the firemen had chopped another opening in the roof and had pulled down a ceiling in an upstairs bedroom (adjacent to the attic space through which the flue pipe ran) to reach the fire, and the rafters had been charred deeply over a considerable area. No complaint is made here concerning the amount of damages assessed.

The basic factual issues upon trial of plaintiffs' claim of negligent installation were (1) as to whether the flue pipe had been left bare and uninsulated for a space of four to five inches at or just below the roof and (2) as to whether heat from the flue pipe had started the fire. On the *first issue,* the direct evidence was in irreconcilable conflict. *Plaintiff Margaret* testified that, both *before* and *after* the

fire, she had seen the uninsulated flue pipe, bare for a vertical distance of four or five inches just below the roof, "enough times that I was worried"—"I would say about ten times"; and that, in fact, her observation of this insulation gap *before* the fire "was the reason I was calling [upon Raney] for an inspection." However, she did not mention the insulation gap in her telephone conversations with Raney, and she did not point out the gap to him personally because she worked outside the home "from seven till five" and was not at home when Raney made his prefire inspection.

On the other hand, Raney of *Day and Night* stated that there was no insulation gap and no exposed section of the flue pipe when he inspected the installation *before* the fire; and both Harold Dooley of *Empire,* who "built" the additional sections of flue pipe and installed them, and Ralph Cline of *Empire,* who assisted in installation, insisted that, when they completed and left the job, there was no insulation gap and no portion of the flue pipe was bare.

As Empire states in its brief, "everyone admits" that there was a gap in the insulation and chicken-wire mesh *after* the fire; and Empire poses the query, "is it not probable that a fireman working on the roof cut open the wire and insulation for purposes of inspection to make sure that all possible sources of burning had been extinguished?" But there was no evidence to that effect, and any such finding would rest on nothing more than sheer speculation and unbridled surmise.

When Raney of *Day and Night* inspected the flue pipe in the attic area of the Listerman home about *11 A. M. on Monday, October 22, 1962,* in response to plaintiff Margaret's postfire telephonic request on Saturday, October 20, *he found (so he testified) no insulation gap*—"it looked like it did when I first saw it" *before* the fire. No representative of *Empire* made a postfire inspection of the Listerman home until

Clarence Dooley, Empire's president-treasurer, went there some three or four weeks after the fire. Dooley then found (so he stated upon trial) that the chicken-wire mesh "had been cut right straight around. It was a new cut. * * * The wire was cut across the mesh; the insulation had been removed for a space of some two or three inches * * * right at the roof level. That's when I decided that the fire inspector should be brought out." Shortly thereafter Dooley, accompanied by Raney and Green of Day and Night and by Willard Sharp, fire warden of the Springfield Fire Department, returned to the Listerman home and Dooley took Sharp "personally inside at that time and showed him where the wire had been cut and the insulation removed." According to Dooley, Sharp "told me that he hadn't noticed it before."

The testimony of fire warden Sharp, a witness for *plaintiffs,* did not run in the same channel as that of Raney and Dooley. Sharp made three postfire trips to the Listerman home, the first of which was about *9 A.M. on Monday, October 22,* some two hours before the first postfire inspection by Raney of Day and Night, to which we have referred in the last preceding paragraph. Upon examination by the court, Sharp stated that the flue pipe "was completely bare—there was no covering on it at all—no insulation over it" for a space of about four inches "just below the roof, the shingles of the roof." And, in response to the inquiry whether there was "any evidence of that wire [chicken-wire mesh] having been cut," Sharp responded, "Oh, I could see no indication that it had been cut. I don't know how it was put on there to begin with * * * so I would hesitate to say it was cut."

Plaintiffs' witness Williams, a carpenter-contractor who inspected the Listerman home in November 1962 and repaired the damage to the roof, observed the insulation gap at the roof for a vertical distance of "approximately four to six inches"; and, more importantly here, when asked

"whether the chicken wire had been cut at that point," Williams replied, "it did not look like it had to me, sir."

On the *second issue,* i. e., as to whether heat from the flue pipe had started the fire, plaintiffs relied upon circumstantial evidence and the opinion evidence of fire warden Sharp, for thirteen years a member of the Springfield Fire Department and for four years a fire warden engaged in "inspection, fire prevention, investigations." From the plaintiffs' standpoint, the gist of Sharp's testimony was his opinion that heat from the flue pipe at the roof line was the "probable cause of the fire." Although conceding on cross-examination that "other things may or may not have contributed to this" fire, Sharp also said that he had found no evidence of any other cause and again that "I can think of only one cause."

As Empire's counsel emphasize, the roof was not burned through at the flue pipe but the edge of the hole in the roof was "one foot or two *foot*" (so plaintiff Margaret said) or "two or three feet" (so carpenter-contractor Williams and warden Sharp estimated) or "possibly three feet" (so district fire chief Charles Hicks thought) from the flue pipe, and the hole was above a second-floor bedroom adjacent to and just north of the attic area through which the vertical flue pipe ran. But the location of the hole must be considered in connection with other record facts. The flue pipe passed through the roof at a point *south* of the ridgepole which ran east and west; and, since (as we have noted) the pitch of the roof was "very steep," the roof from the flue pipe to the *north* (and thus toward the hole) sloped sharply upward. The roof itself consisted of an underlying old wooden shingle roof laid in 1947 covered by a composition ("asbestos" so plaintiff Margaret thought, but "asphalt" so warden Sharp stated positively) shingle roof laid over the wooden shingle roof in 1954. Sharp testified that the underlying wooden shingles, fifteen years old and quite dry, were in a

"pyrophoric condition" and "broken down to where the fibers were easily ignited" at a temperature of "around 300 degrees," much lower than the temperature of 500 to 600 degrees ordinarily required to ignite wood; that burning paper produces a temperature of 1250 to 1800 degrees, with the heat increasing as the paper is consumed; and that the temperature of the gas formed by the fire rises as it "goes up through the flue." Elaborating upon his opinion as to the cause of the fire, Sharp stated his belief that heat from the flue pipe radiated to the nearby wooden shingles which became ignited, and that, since "fire travels upward" and the roof sloped sharply upward from the flue pipe to the north, the fire broke through the roof above and north of the flue pipe. It also was pointed out in the record that there was a metal flange or flashing on the roof around the flue pipe which would have inhibited the fire from breaking through next to the pipe, and that "the whole roof *underneath* was charred"—"the underside was charred, but *not any * * * to speak of on top; it was all underneath."

Neither Day and Night nor Empire offered any opinion evidence; but, upon cross-examination of warden Sharp and district fire chief Hicks, who supervised the firemen in extinguishing the blaze, counsel developed several details here emphasized in argument. For example, warden Sharp conceded that, in his written report concerning this fire, he had not mentioned the insulation gap at the roof level, and he quickly acknowledged that he would have needed precise information as to various factors (such as "how much paper was involved and how long it burned" in the heater, the exact distance from the heater to the roof line, and the temperature in the attic when the fire was started in the heater) "to determine the exact temperature of any portion of that flue." Counsel further obtained Sharp's ready agreement that, *if* Raney of Day and

Night had, prior to the fire, applied "tar" to seal the flashing on the roof around the flue pipe and *if* that "tar" had not melted or run as a result of the fire, it would have been "indicative * * * that there was not very much heat immediately below that area"; but the stated assumptions rested *solely* on Raney's testimony and credibility, since no other witness testified to the same effect and Sharp was not on the roof either before or after the fire. This already tedious factual review need not be extended further by the recitation of additional details, which simply would bear upon the credibility of witnesses and the weight and value to be accorded to their testimony.

■ Empire's initial contention is that the trial court erred in requiring Empire to indemnify Day and Night, "because if there was negligence, the parties were in pari delicto." It is true that, as Empire reminds us, where joint tort-feasors are in pari delicto neither is entitled to indemnity from the other. Union Electric Co. v. Magary, Mo., 373 S.W.2d 16, 22 (3); Johnson v. California Spray-Chemical Co., Mo., 362 S.W.2d 630, 633(2); Joshmer v. Fred Weber Contractors, Inc., Mo.App., 294 S.W.2d 576, 588. But the statement of the principle itself suggests, and the cases demonstrate, that "in many situations, joint tort-feasors are held not to be in pari delicto." Johnson, supra, 362 S.W.2d at 633. See McDonnell Aircraft Corp. v. Hartman-Hanks-Walsh Painting Co., Mo., 323 S.W.2d 788, 793; Busch & Latta Paint Co. v. Woermann Const. Co., 310 Mo. 419, 437–440, 276 S.W. 614, 619–620(8, 9). Thus, "where one party creates the condition which causes injury and the other does not join therein but is exposed to liability on account of it, the rule that one of two joint tort-feasors cannot maintain an action against the other for indemnity does not apply."[3] Otherwise stated, one held liable for negligence may

3. Barb v. Farmers Insurance Exchange, Mo., 281 S.W.2d 297, 304(11); Kansas

City Southern Ry. Co. v. Payway Feed Mills, Inc., Mo., 338 S.W.2d 1, 5(2).

secure indemnity from another " 'where it [seems] reasonable and desirable to impose the ultimate responsibility on the person found to have played the active or primary role in the negligent situation in favor of one also held liable, but whose part in the event is passive or secondary. In such situations the parties are said not to be in pari delicto.' " Johnson, supra, 362 S.W.2d at 633; State ex rel. Siegel v. McLaughlin, Mo.App., 315 S.W.2d 499, 502. Again, it is said that "the negligence of the party responsible for the dangerous condition is active and primary while the negligence of the other is passive and secondary" [Kansas City Southern Ry. Co. v. Payway Feed Mills, Inc., Mo., 338 S.W.2d 1, 5] and that "[p]assive negligence will not bar recovery of indemnity from a joint tortfeasor whose active negligence created the dangerous condition." [338 S.W.2d at 7 (4)]

■ In the instant case, Empire's status with respect to the installation in question was that of an independent subcontractor. Its employees installed the fireplace unit, the insulated flue pipe, and the rectangular metal casings around the flue pipe, and no employee of Day and Night participated in, or was present during, that installation. So, it is plain that Empire created the condition which exposed Day and Night to liability and upon which plaintiffs predicated their pleaded charge of negligence against Day and Night, i. e., "that the sheet metal work in the flue was inadequately insulated against the wood rafters, roof and other wood objects through which the flue was installed," and that plaintiffs sought to recover, and did recover, upon negligence imputed to Day and Night by reason of its legal relation with Empire. If Day and Night was negligent, it was in failing to discover and correct the condition caused solely by Empire. But no such negligence was charged;

and, even if it had been, recovery of indemnity by Day and Night would not have been precluded thereby, for "[o]ur courts have, in a long line of cases, permitted the recovery of indemnity by those to whom negligence is imputed as a purely secondary liability, or where the legal negligence of the indemnitee rests solely in his failure to discover and correct a dangerous condition caused solely by the one sought to be charged." Crouch v. Tourtelot, Mo. (banc), 350 S.W.2d 799, 805(10), and cases there cited. See Busch & Latta Paint Co., supra, 310 Mo. at 437–439, 276 S.W. at 619; Pierce v. Ozark Border Electric Coop., Mo., 378 S.W.2d 504, 507; State ex rel. Siegel, supra, 315 S.W.2d at 507(5). Empire's initial contention must be rejected.

■ Empire's other points go to the merits of plaintiffs' claim and challenge the sufficiency of the evidence to have permitted the judgment obtained by plaintiffs against Day and Night. But Day and Night insists that we properly may not consider those points, because (so its counsel assert) the judgment on plaintiffs' petition, from which Day and Night did not appeal, "is not binding on [Empire] with respect to all issues therein determined and, therefore, the trial court's findings of negligence cannot now be questioned." Declaring that "third-party practice is merely procedural" and that the same rule should be applicable here as in a separate suit for indemnity, Day and Night's counsel rely upon the statement of principle in 42 C.J.S. Indemnity § 32a, p. 613, that "[w]here an indemnitor has notice of a suit against his indemnitee and has been afforded an opportunity to appear and defend, a judgment therein rendered against the indemnitee, if without fraud or collusion, is conclusive against the indemnitor in respect of all questions therein determined * * *."[4] Our Missouri cases

See Woods v. Juvenile Shoe Corp. of America, Mo., 361 S.W.2d 694, 697(5); Busch & Latta Paint Co. v. Woermann Const. Co., 310 Mo. 419, 437, 276 S.W. 614, 619(8).

4. The only case cited by counsel under this point is B. Roth Tool Co. v. New Amsterdam Cas. Co., 8 Cir., 161 F. 709, 711.

refine and enunciate this general principle in somewhat more restrictive and demanding terms: "Where one is bound to protect another from a liability, he is bound *by the result of a litigation* to which such other is a party, provided he had notice of the litigation, and *opportunity to control and manage it.*" [5] It is true, as Day and Night's counsel state, that Empire had notice of plaintiffs' suit and *"an opportunity to participate in the defense";* that "Day and Night made a genuine and good faith defense of plaintiffs' claim"; and that there is no showing that Empire requested Day and Night to appeal from the judgment nisi or offered to prosecute such appeal on behalf of Day and Night at Empire's expense. But, on the other hand, it is not shown that Empire was accorded the *"opportunity to control and manage"* the litigation—an opportunity which certainly would have encompassed that of obtaining appellate review of the judgment for plaintiffs on their petition. See Restatement, Judgments, § 107, comment e at 516.

■ However, there are other and more compelling reasons which persuade us that appellate consideration of Empire's points attacking the judgment for plaintiffs is not precluded. The issues joined upon plaintiffs' petition and those joined upon Day and Night's third-party petition were tried at the same time and upon the same evidence; all of those issues were adjudicated at the same time and in the same judgment; Empire's timely motion for new trial presented, inter alia, the same assignments of error directed to the judgment for plaintiffs as are presented in the "points relied on" in Empire's appellate brief; Empire gave notice of appeal, and in good faith sought to appeal, from "the judgment entered in this action on the 10th day of September, 1963," which, as we have said, adjudicated the issues upon plaintiffs' petition as well as those upon Day and Night's third-party petition; and, on the instant record, Empire's liability vel non to Day and Night not only depended upon, but also followed as a shadow follows the object casting it, the liability vel non of Day and Night to plaintiffs.

■ V.A.M.S. § 512.020 grants the right of appeal to "[*a*]*ny party to a suit aggrieved* by any judgment of any trial court in any civil cause * * *." Since Empire was a party to this suit, whether or not its notice of appeal was adequate and effective to permit appellate review of that portion of the judgment adjudicating the issues upon plaintiffs' petition turned upon whether or not Empire was "aggrieved" thereby, within the contemplation and meaning of the cited statute. Counsel have cited, and we have found, no reported situation involving a third-party defendant in which the precise question under consideration has been discussed. And, although we have examined various broad definitive statements as to when a person or party is "aggrieved," [6] our review of numerous cases impels the conclusion that

5. Missouri Dist. Tel. Co. v. Southwestern Bell Tel. Co., 336 Mo. 453, 462, 79 S.W. 2d 257, 260(7); Kansas City, M. & B. R. Co. v. Southern Railway News Co., 151 Mo. 373, 390, 52 S.W. 205, 209(4), 45 L.R.A. 380; Garrison v. Babbage Transp. Co., 94 Mo. 130, 137, 6 S.W. 701, 703; Strong v. Phoenix Ins. Co., 62 Mo. 289, 295; Murch Bros. Const. Co. v. Fidelity & Casualty Co. of New York, 190 Mo.App. 490, 516, 176 S.W. 399, 406; Whitaker v. McCormick, 6 Mo.App. 114, 116–117(2). See also City of St. Joseph v. Union Ry. Co., 116 Mo. 636, 643, 22 S.W. 794, 795; Brinkman v. Western Automobile Indemnity Ass'n., 205 Mo. App. 71, 78, 218 S.W. 944, 945; City of Columbia v. Malo, Mo.App., 217 S.W. 625, 628(3); annotation 73 A.L.R.2d 504, 524–526.

6. "Generally speaking, a party or person is aggrieved by a judgment * * * whenever it operates prejudicially and directly upon his property, pecuniary, or personal rights." Schumacher v. Schumacher, Mo.App., 223 S.W.2d 841, 845 (12). "It may be said that an aggrieved party, within the meaning of the rule governing appeals, is one having an interest recognized by law in the subject matter which is injuriously affected by the judgment, or one whose property rights or personal interests are directly

whether or not a given appellant is "aggrieved" may not be determined by application of any definition or formula but depends upon the circumstances of the particular situation at hand. See the discussion in Dubinsky Brothers, Inc. v. Industrial Com'n. of Missouri, Mo. (banc), 373 S.W.2d 9, 12–14.

More than seventy years ago, our Supreme Court held in Nolan v. Jones, 108 Mo. 431, 435–437, 18 S.W. 1107, 1108(3), that under the then governing statute [RSMo 1879, § 3710] which gave the right of appeal to "every person aggrieved" by a final judgment, sureties were "aggrieved" persons who might appeal from a judgment against their principal alone. See In re Switzer, 201 Mo. 66, 83–86, 98 S.W. 461, 463; Calhoun v. Gray, 150 Mo.App. 591, 601, 131 S.W. 478, 481(10). *On the record before us,* adjudication of the issues upon plaintiffs' petition no less "injuriously affected and concluded" Empire's "rights" and "interests" under the third-party petition. Cf. Nolan, supra, 108 Mo. at 436, 18 S.W. at 1108.

■■■■ Although the right of appeal is purely statutory and, where not given by statute, no such right exists,[7] statutes authorizing appeals should be construed liberally for appeals are favored in the law;[8] and, where doubt exists as to the right of appeal, it should be resolved in favor of that right. In re Dugan's Estate, Mo.App., 309 S.W.2d 137, 143(14); Mullin v. Trolinger, 237 Mo.App. 939, 179 S.W.2d

484, 487(3). Expressly limiting the scope and effect of our holding to the specific situation before us, we are of the opinion that Empire was "aggrieved" by, and that its notice of appeal was adequate and effective to permit appellate review of, that portion of the judgment which adjudicated the issues upon plaintiffs' petition.

■■■■ One of Empire's points is that "the court erred in finding defendant, Day and Night, negligent in the erection of the fireplace because defendant followed plans furnished by plaintiffs." The "plans," to which counsel refer, are those contained in Sears' instruction booklet delivered by plaintiff Margaret to Raney of Day and Night and thereafter by Raney to Dooley of Empire. Of course, nothing in the Sears' instruction booklet suggested or sanctioned installation of the flue pipe with a gap in the insulation; and, in the argument section of Empire's brief, we find that the above-quoted point is predicated on counsel's *assumption* "that at the time of the installation there was no gap in the insulation." However, this assumption is unwarranted because, as we have noted, plaintiff Margaret testified positively that, prior to the fire, the flue pipe was bare and uninsulated for a vertical distance of four or five inches just below the roof. True, Day and Night's and Empire's evidence was to the contrary. But, with no specific findings of fact requested or made, this and all other issues of fact were ruled in favor of plaintiffs by the general finding and judgment for them.[9] And, even though

affected by the operation of the judgment or decree." 4 Am.Jur.2d, Appeal and Error, § 183, p. 692. See also 4 C.J.S. Appeal and Error § 183b(1), p. 559.

7. Walker v. Thompson, Mo., 338 S.W.2d 114, 116(3); Wicker v. Knox Glass Associates, Inc., 362 Mo. 614, 242 S.W.2d 566, 571(8); State ex rel. Kassen v. Carver, Mo.App., 355 S.W.2d 324, 330; Kallash v. Kuelker, Mo.App., 347 S.W.2d 467, 469(1).

8. Fenton v. Thompson, 352 Mo. 199, 176 S.W.2d 456, 459(5); Robertson v. Manufacturing Lumbermen's Underwriters,

346 Mo. 1103, 1109, 145 S.W.2d 134, 136; Tooker v. Missouri Power & Light Co., 336 Mo. 592, 595, 80 S.W.2d 691, 692, 101 A.L.R. 365; O'Malley v. Continental Life Ins. Co., 335 Mo. 1115, 75 S.W.2d 837, 839(2); In re Dugan's Estate, Mo. App., 309 S.W.2d 137, 143(13).

9. V.A.M.R. Rule 73.01(b); V.A.M.S. § 510.310(2); McCullough v. Newton, Mo., 348 S.W.2d 138, 142(2); Sando v. Phillips, Mo., 319 S.W.2d 648, 652(9); Lange v. Baker, Mo.App., 377 S.W.2d 5, 6(1); Davis v. Broughton, Mo.App., 369 S.W.2d 857, 862(4).

we independently consider the evidence and reach our own conclusions, we usually defer to the finding of the trial court upon salient factual issues where, as here, the evidence thereon is in irreconcilable conflict and the determination thereof necessarily must rest upon the credibility of the witnesses and the weight to be accorded to their testimony.[10] As many writers have commented, such deference is fitting and proper in view of the superior opportunity of the trial court to judge of "the credibility and characteristics of the witnesses who testified before him."[11] Following the finding of the trial court rather than the assumption of Empire's counsel upon the disputed factual issue as to whether there was a gap in the insulation just below the roof, the point under discussion must be disallowed.

In another point, Empire contends that "the evidence was insufficient to permit the court to find that the fire was caused by inadequate insulation around the flue pipe of the fireplace unit." This point is presented with an earnest factual argument but without citation of authority. The evidence has been hereinbefore reviewed in considerable detail and need not be restated, rehashed or resifted. We recognize that there were conflicts and inconsistencies in the evidence, that it was not satisfying in all particulars, and that it by no means compelled a finding and

judgment for plaintiffs. However, the only opinion evidence as to the cause of the fire was that of warden Sharp who, immediately after affirming his observation of the insulation gap, stated his opinion that heat from the flue pipe at the roof level was the "probable cause of the fire." There is no contention by Empire that opinion evidence as to the cause of the fire under consideration should not have been received [see State v. Paglino, Mo., 319 S.W.2d 613, 622–623(8)], and there is no "point relied on" in Empire's brief which assigns error in the admission of Sharp's opinion. " 'An expert opinion expressed by one properly qualified and based upon sufficient means of knowledge is evidence.' "[12] As Empire's counsel stress, Sharp's opinion was one of probability, not of certainty, but " '[a]n expert's view of possibility or probability is often helpful and proper.' "[13] "[T]he testimony of experts is to be considered like any other testimony, is to be tried by the same tests, and receive just so much weight and credit as the [trier of the facts] may deem it entitled to when viewed in connection with all the circumstances * * *."[14] The credibility of warden Sharp and the weight and value to be accorded to his expert opinion, which we regard as having been based on substantive evidence, were for the trier of the facts. Capra v. Phillips Investment Co., Mo. (banc), 302 S.W.2d 924, 931(8).

10. Leggett v. Missouri State Life Ins. Co., Mo. (banc), 342 S.W.2d 833, 850 (2); Day v. Blackbird, Mo., 331 S.W.2d 658, 660(2); In re Petersen's Estate, Mo., 295 S.W.2d 144, 148(3); Hoover v. Whisner, Mo.App., 373 S.W.2d 176, 182(7); Rector v. Tobin Const. Co., Mo. App., 351 S.W.2d 816, 820(1).

11. Spaeth v. Larkin, Mo., 325 S.W.2d 767, 771(3); Cull v. Pfeifer, Mo., 307 S.W.2d 424, 428(5); Peine v. Sater, Mo., 289 S.W.2d 101, 102(1); Allen v. Smith, Mo. App., 375 S.W.2d 874, 880(8). See Hampton v. Niehaus, Mo., 329 S.W.2d 794, 800(6), 801–802(9, 10).

12. State v. Paglino, Mo., 319 S.W.2d 613, 623(9); State v. Menard, Mo., 331 S.W.

2d 521, 524(2); Eickmann v. St. Louis Public Service Co., 363 Mo. 651, 663, 253 S.W.2d 122, 129(7).

13. Citizens Bank of Festus v. Missouri Natural Gas Co., Mo., 314 S.W.2d 709, 715, 72 A.L.R.2d 855, Kimmie v. Terminal R.R. Ass'n. of St. Louis, 334 Mo. 596, 605, 66 S.W.2d 561, 565(9); York v. Daniels, 241 Mo.App. 809, 833, 259 S.W.2d 109, 122(6).

14. Scanlon v. Kansas City, 325 Mo. 125, 150, 28 S.W.2d 84, 95(15); State v. Quilling, 363 Mo. 1016, 1021, 256 S.W.2d 751, 752(2); State v. Bannister, Mo., 339 S. W.2d 281, 282. See Hotchner v. Liebowits, Mo.App., 341 S.W.2d 319, 328(11).

Taking the evidence in its totality, we have no doubt but that plaintiffs made a submissible case on alleged negligence in inadequate insulation of the flue pipe.[15] And remaining mindful of the plain admonition that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses" and being unable to say, after painstaking examination of the record, that the judgment was "clearly erroneous," it becomes our plain duty to affirm it. V.A.M.R. Rule 73.01(d); V.A.M.S. § 510.310(4).

In so concluding, we have not overlooked Empire's further point that "the court erred in finding Empire liable in indemnity to Day and Night for installing the fireplace in violation of the building code of the City of Springfield, for want of proximate cause." But we need not probe the legal effect of failure to obtain a building permit from the City of Spring-field for installation of plaintiffs' fireplace heater. For there is no record indication that the judgment under review was predicated upon violation of the building code by Day and Night or Empire; and, since there was no request for a finding of facts and only general findings for plaintiffs on their petition and for Day and Night on its third-party petition, we should sustain the judgment if the evidence supports it upon any legal theory permitted by the pleadings.[16]

Believing, as we have stated, that the judgment was permissible and proper on the pleaded theory of alleged negligence in inadequate insulation of the flue pipe, for which Empire, as the sole creator of the condition causing injury, was liable over to Day and Night, the judgment should be and is in all respects affirmed.

RUARK, P. J., and HOGAN, J., concur.

15. Capra v. Phillips Investment Co., Mo. (banc), 302 S.W.2d 924, 930–931; State v. Paglino, supra, 319 S.W.2d at 621–625; Fair Mercantile Co. v. St. Paul Fire & Marine Ins. Co., 237 Mo.App. 511, 175 S.W.2d 930. See Moyers v. Sears-Roebuck & Co., 242 Iowa 1038, 48 N.W.2d 881; Korschot v. Leevy, Ind. App., 178 N.E.2d 750; Manney v. Housing Authority of City of Richmond, 79 Cal.App.2d 453, 180 P.2d 69.

16. Glenn v. Offutt, Mo.App., 309 S.W.2d 366, 368(3); Emerson v. Treadway, Mo. App., 270 S.W.2d 614, 621, 624(29); Hess v. Hessel, Mo.App., 102 S.W.2d 729, 730(2); State ex rel. and to Use of Tate v. Baird, Mo.App., 186 S.W. 587, 588(2). See McCrory v. Monroe, Mo. App., 336 S.W.2d 118, 121(1); Tillery v. Crook, Mo.App., 297 S.W.2d 9, 12; Powell v. Schultz, Mo.App., 118 S.W.2d 25, 30–31.